**Nicholas A. PALMIGIANO et al.**

v.

**J. Joseph GARRAHY et al.**

**Thomas R. ROSS et al.**

v.

**J. Joseph GARRAHY et al.**

**Civ. A. Nos. 74–172 and 75–032.**

United States District Court,
D. Rhode Island.

Aug. 10, 1977.

Robert B. Mann, Providence, R. I., Matthew L. Myers, of the National Prison Project, Washington, D. C., John Farley and Joseph L. DeCaporale, Jr., Deputy Public Defenders, Providence, R. I., for plaintiffs.

William G. Brody, Sp. Asst. Atty. Gen., Providence, R. I., Valentino D. Lombardi, Chief Legal Counsel, R. I. Dept. of Corrections, Cranston, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This is a consolidated class action brought by five prisoners confined in the Rhode Island Adult Correctional Institutions (ACI) and by the National Prisoners Reform Association on behalf of all the prisoners incarcerated at the ACI. The plaintiff class, numbering over 650, includes pre-trial detainees as well as sentenced prisoners. Plaintiffs claim that the conditions under which they are confined violate the Eighth and Fourteenth Amendments to the United States Constitution, as well as various provisions of state law. They contend that the violations are so gross as to justify broad injunctive relief, including the permanent closing of the Maximum Security Building at the ACI complex in Cranston, Rhode Island. No damages are sought in this action.

Plaintiffs make four principal claims. First, that the defendants subject inmates housed in the Maximum and Medium Buildings to constitutionally intolerable levels of fear and violence. Second, that the defendants subject those prisoners to constitutionally intolerable conditions of confinement, including gross filth, unsanitary living quarters, unsanitary food services, dangerously inadequate medical care, and near-total idleness, all causing the physical and mental deterioration of inmates. Third, that pre-trial detainees are punitively subjected to conditions even worse than those suffered by sentenced inmates, and far in excess of any conditions reasonably necessary to insure their presence at trial. Fourth, that prisoners in protective custody are subjected to conditions worse than those suffered by sentenced prisoners, an alleged violation of the equal protection clause of the Fourteenth Amendment.

Jurisdiction of this action arising under 42 U.S.C. § 1983 is conferred by 28 U.S.C. §§ 1343(3) and (4). The class was certified by order of July 23, 1976. Pendent jurisdiction is assumed over the state law claims, since they arise out of the same nucleus of fact as the federal constitutional claims and

are likely to reduce the necessity for constitutional adjudication. *Smith v. Sullivan*, 553 F.2d 373 (5th Cir. 1977).

I

After extensive discovery, a trial was held which extended over two weeks. The findings of fact required by Fed.R.Civ.P. 52 are set forth herein, and are based on the testimony received at trial, stipulations by the parties and extensive exhibits, including depositions of various officers of the Department of Corrections. The Court's task was made easier by the extensive assistance of experts from various fields of corrections, institutional environmental health and sanitation, and correctional psychology. Although their qualifications, with few exceptions, will not be recounted herein, it suffices to say that the Court found them all extremely well-qualified, articulate, and fair. Their testimony was hardly disputed or contradicted by the defendants.[1] The Court also toured the institution during the trial. It should be noted that the Court has extensive familiarity with the ACI stretching over almost a decade. *See, e. g., Morris v. Travisono*, 310 F.Supp. 857 (D.R.I.1970); *id.*, 373 F.Supp. 177 (D.R.I.1974), *aff'd* 509 F.2d 1358 (1st Cir. 1975); *Ben David v. Travisono*, 373 F.Supp. 177 (D.R.I.1974), *aff'd* 495 F.2d 562 (1st Cir. 1974); *National Prisoners Reform Association v. Sharkey*, 347 F.Supp. 1234 (D.R.I.1972); *Souza v. Travisono*, 368 F.Supp. 959 (D.R.I.), *aff'd in part* 498 F.2d 1120 (1st Cir. 1974).

To avoid extending an already lengthy opinion, the Court will not, in most instances, make specific findings of fact regarding deficiencies and inadequacies as they pertain to individual inmates. Extensive testimony, from inmates and from experts who examined inmate records, documents the cumulative case presented here, a case which would be neither added to nor detracted from by recitation of additional incidents.

Approximately 544 of the 661 plaintiff-inmates at the ACI are confined in two buildings at the ACI complex, which will be referred to as Maximum Security or Maximum and Medium Security or Medium. As will appear in greater detail, the latter name is a misnomer, for the inmates housed therein are with few exceptions all inmates classified as maximum security, but granted protective custody to protect them from other inmates, either at their own request or by decision of the Department. Approximately 117 other inmates, in minimum custody and work-release programs, are housed in other buildings at the ACI complex. As did the parties at trial, this opinion will focus on the conditions under which the 544 inmates in Maximum and Medium are confined.

1. *Living Conditions in Maximum Security*

The Maximum Security Building is over 100 years old, built for a capacity of 55 inmates at a time when penological practice dictated that prisoners be incarcerated in their cells throughout their imprisonment. It was well designed for that purpose, but it is inadequate for twentieth century correctional purposes. For at least the last five years, Maximum has held over 420 inmates, usually including 125 pre-trial detainees and 25 recently sentenced inmates, who by law are supposed to be confined apart from the general population for up to 30 days. At trial, the defendants finally conceded that Maximum has outlived its usefulness, and that it is unmanageable for anywhere near the number of inmates now confined there.

The building consists of massive iron cellblocks, arranged usually with cells in three ascending tiers reached by catwalks. The walls of the building are made of porous stone. They are impossible to keep clean and are encrusted with literally decades of dirt and grime. Between the tiers and the outer wall there is a walkway. The huge windows on the outer wall contain

---

1. For this reason, much of the evidence presented by defendants at trial is not recounted here. The Court has considered all of the evidence proffered by defendants, but finds that it failed for the most part to contradict the evidence offered by plaintiffs, or to address the issues raised in this case.

numerous broken or missing panes of glass. The window ledges are heaped with dust, dirt, and assorted trash. It is plain that no serious attempt has been made to clean them in months, if not years. By all accounts, housekeeping has deteriorated throughout Maximum drastically, and irremediably, in the last decade. Without major reconstruction and renovation, it is impossible to maintain minimum standards[2] of sanitation and cleanliness in Maximum. A number of experts with wide experience in managing and studying prisons across the country testified that Maximum was the filthiest prison they had ever encountered. The Court accepts this assessment as accurate; certainly, nothing that the Court observed on its view of Maximum would in any way undermine its credibility. Trash abounds on the floors and in empty cells. The entire structure is massively infested with cockroaches, rodents, mice, and rats, each of which carries disease throughout the prison. There are cats living in Maximum, and cat feces were observed on the floors of living areas and the showers. In parts of the building, the roof leaks rainwater, and tiles were falling off the ceiling onto the floor.

Plumbing throughout Maximum is unsanitary, inadequate, and an imminent danger to public health. It is as old as the building. Only cold water is available in inmate cells, although minimum standards for correctional institutions formulated, *inter alia*, by the Department of Justice require hot water as a health measure. Pipes are not equipped with vacuum breakers, creating an ever-present danger that waste water will back up into the fresh water system, even in the food preparation area. There is no regular maintenance program to guard against this threat. Plumbing leaks throughout the cell tiers, particularly in the service areas which run down the middle of each tier dividing the front from the back cells. Because these service areas house the electrical wiring, the leaking pipes present a serious risk of electrical fire. The damp conditions in the service areas are an ideal breeding area for the swarming cockroaches, which exist in all stages of development.

In the lavatories, the Court observed large pools of standing water on the floor, and apparently this is always present. There was a stench of urine coming from this water. The shower areas were filthy, covered with mold and mildew on the floors and the walls. Glass, trash, and dead cockroaches are everywhere on the shower floors. Not infrequently, inmates burn themselves on the hot water pipes which rise uncovered in the showers.

Lighting is inadequate for prisoners to read safely in their cells. Minimum standards require 30 foot-candles; the average range in Maximum was between 10 and 15. Aside from the adverse effects on prisoners' vision, inadequate lighting increases tension and fatigue among prisoners and guards. Not incidentally, adequate lighting could serve as a significant deterrent to the appearance of roaches and rodents.

The noise level throughout Maximum is deafening and maddening, and must inevitably increase the levels of both tension and psychological distress. There is a constant din from radios and televisions, each at-

---

2. At various points throughout this Opinion, the Court will refer to "minimum standards." Each expert attempted to measure conditions at the ACI according to the minimum standards for similar institutions promulgated by various professional organizations. *See, e. g.*, National Advisory Commission on Criminal Justice Standards and Goals, *Corrections* (1973); Graham Walton, Myrl Alexander, and the U.S. Bureau of Prisons, *Institutional Sanitation* (1965); American Public Health Association, *Standards for Health Services in Correctional Institutions* (1976); U.S. Department of Health, Education, and Welfare, Public Health Service, *Food Service Sanitation Manual* (1962); Joint Committee on the Legal Status of Prisons of the American Bar Association, *Tentative Draft of Standards Relating to the Legal Status of Prisoners*, reprinted in 14 Am.Crim.L. Rev. 377 (1977), 21 Crim.L.Rep. 3213 (July 20, 1977); American Correctional Association, *Manual of Correctional Standards* (1966); National Sheriffs' Association, *Standards for Inmates Legal Rights* (1974). While variance from any of these standards does not establish *per se* a constitutional violation, the standards have generally been drawn to establish minimally acceptable health, sanitary, and living conditions. *See* n. 30 *infra*; *see also* the appendix to this Opinion.

tached by a wire antenna from the cells to the outer windows in a grotesque Maypole effect.

The heating and ventilation system is antiquated and incapable of providing minimally adequate heat and ventilation. Heating pipes are all located on the outer walls. There is no mechanical system to transfer and spread hot air, or fresh air. As a result, most cells are cold throughout the winter. One expert took readings in the lower cell areas and found the midday temperature at 50° in January and 55° in April. Minimum standards for institutional health are presently set by public health experts at 65°. Prisoners and guards make frequent complaint of winter cold, which lowers resistance to disease. Another expert observed that he had never before inspected a prison where inmates and guards wore heavy coats, day and night, during the winter. Nor is the unacceptable level of discomfort confined to the winter months. During the summer the institution is unbearably hot and damp, and the top tiers are particularly stifling.[3] Indeed, it was not disputed that the present heating and ventilation system in Maximum is incapable of providing minimally adequate heating according to relevant public health standards, and that it cannot be upgraded without uneconomic expenditures.

■ There are numerous fire hazards throughout the institution, a cause for grave concern. Many prisoner mattresses are made of a polyurethane foam material which for more than a year has been banned for consumer use by the Federal Consumer Product Safety Commission because of the poisonous fumes it releases on combustion. The Court takes judicial no-

tice that between the time of trial and preparation of this opinion, 42 inmates died in a Tennessee jail fire, reportedly from inhaling fumes released by polyurethane used in mattresses and padded walls.[4] The urgency of this situation cannot be overstated, for it is common for prisoners in Maximum to set fire to other prisoners' cells. In an attempt to secure a measure of privacy, and to reduce cold drafts, many inmates have woven paper plates, magazine covers, and other paper goods between the iron bars of their cell doors. It is apparent that this practice is a major fire hazard. Worse, it occurs on many upper tiers which have only a single means of egress, inadequate by any minimum standards of fire safety.[5] Among the other serious fire hazards, the Court particularly notes the clothes dryer area in the Behavior Control Unit (BCU), of Maximum, which is inadequately ventilated. Indeed, nearly all the laundry areas present a serious risk of electrical fire, with exposed electrical wiring and overused domestic washing machines designed for home use.

Conditions in the food service area in Maximum were so deplorable that plaintiffs' public health expert testified that the food service operation presented an imminent public health danger and that he would order it closed immediately if it were under his jurisdiction. There was evidence of rats, mice, and cockroaches throughout. The Court observed sacks of grain and boxes of crackers stored on top of garbage cans outside the kitchen door, which was wide open, with pigeons wandering about. Stoves and ventilation hoods were encrusted with grease and grime. Mice droppings were found in open food containers in both

---

3. The Associate Director of Maximum Security observed:

> During the summer the whole institution is damp at night and again you have the situation where the inmates on the top tier are suffocating, and the inmates on the bottom tier really feel the dampness.

Brule Dep. at 11–12, pl. ex. 25.

4. The statement by ACI officials to the press after the Tennessee fire publicly claiming that such mattresses had been replaced more than six months ago was contradicted by the evi-

dence and the Court's own inspection. Such misstatements can hardly create confidence in the Department's ability forthrightly to acknowledge its problems, preparatory to solving them.

5. Incredible as it seems, there was no written fire escape plan for inmates in Maximum until July 22, 1977, when the Department prepared one as part of a consent decree in *DeFreitas v. Erickson*, No. 76–0511 (D.R.I. May 18, 1977).

the dry and cold storage areas. The kitchen floor was filthy. One expert observed dead pigeons and flies surrounding the solid waste disposal area, which was just outside an open kitchen door in one of the recreation yards. Tools used to cut meat were filthy. Grease covered kitchen equipment.

Peeling paint was falling from the ceiling throughout the kitchen area, especially in cold food storage area and the dishwashing area, a product of inadequate ventilation and maintenance. This paint is of such ancient vintage that it likely—though no tests were performed—contains lead. Tiles were missing from the walls, and the exposed underwall cannot be cleaned. There was water on the kitchen floor, as well as grease, a serious safety hazard. Plaintiff's public health expert testified that the food temperature he found on a number of testings was in each instance far below the minimum standards necessary to retard bacterial growth. Food preparation, the experts testified, met none of the generally accepted minimum standards for institutional health.

The plumbing in the food service area was also deficient. Hot water was leaking from one pipe. There are no handwashing facilities in this area, nor in an adjacent toilet used by the inmate-staff of the food services.

The inmates who work in the food service receive no training. The lack of training and obvious lack of leadership by outside staff are major causes of the deficiencies observed.

The industrial shops were similarly in a general state of disorder. The floors showed no evidence of recent sweeping. Dirt and grime were spread over machines. A public health expert noted numerous safety hazards, and concluded that no attempt is made to keep the shops either orderly, clean, or safe. There is no safety instruction for inmates working in the shops, nor are there any safety signs.

Environmental health standards in the infirmary area were no better than in the other areas of the prison. The infirmary failed to meet minimum standards for the control of infectious disease. For example, two patients with suspected hepatitis were placed at the back of a ward, necessitating their having to pass through other sick inmates on their way to the shower or lavatory, which they shared with other inmates. Pre-trial detainees for whom there is no room in the Awaiting Trial section are often housed in the infirmary, together with infectious patients. There is no written infection control manual for the infirmary staff, which is largely untrained. There was dirt and trash on the floors, and the bathroom was no more sanitary than the bathroom facilities in the rest of Maximum. The shower drain was defective. Screens on the windows were blocked with debris and dirt. Colostomy bags are simply deposited with other trash in a garbage barrel in the infirmary dormitory. The temperature of the food served to patients was tested and found to be inadequate to retard bacterial growth. Hospital staff were without training in use of the X-ray unit.

Housekeeping throughout Maximum has broken down. Although there is abundant evidence of lack of attention to housekeeping in the cells of various prisoners, the situation is even worse in the common areas of the prison, which must be the basic responsibility of management. The condition of the floors was uniformly bad, with cigarette butts, wrappers, and coffee cups strewn everywhere. There was no evidence which would show that Rhode Island prisoners, unlike prisoners in other states, cannot be motivated to keep the prison acceptably clean. The abdication of any attempt by the Department to maintain a healthful and minimally clean institution was apparent and is a telling comment on the leadership ability of current management. Without question, the age and construction of the building itself are in part responsible. But even in newer parts of the ACI, the housekeeping situation was hardly better, stark evidence of the Department's failure to lead and control. Plaintiffs' public health expert testified that the kitchen area was of good construction and could be kept acceptably clean with proper attention and

cleaning materials. It is not kept clean. It was not disputed that inmates request, and are refused, basic cleaning supplies, such as clean mopheads and soaps, to improve the conditions of their own cells and common passageways. In light of the overall situation it is hardly surprising that some inmates do not clean their own cells. As one witness asked, "what good is an island of cleanliness in a sea of filth?" [6]

Based on the foregoing, the uncontradicted testimony of each of the experts, the Court finds that Maximum presents an imminent public health, fire, and safety hazard. The Court was particularly struck by the testimony of one expert who had directed the prison systems in both Minnesota and Delaware for a number of years. He observed that the ACI was the only prison he had ever visited for which he could find nothing good to say. In common with other witnesses, he found every evidence of a management overwhelmed by the problem of managing a population of prisoners in a building of so many problems, and a staff so accustomed to conditions of deterioration that they had become inured to what they lived with. These conditions and this attitude have a devastating impact on inmates, reinforcing their low self-esteem and making rehabilitation impossible. An expert engaged by the state to counter this testimony was not produced at trial. As the Commissioner of Corrections explained to Governor Garrahy, "this individual was unable to say much good about these matters". On the basis of the physical conditions alone, Maximum is clearly unfit for human habitation according to any criteria used by public health officers or professional corrections personnel. One public health officer with wide experience testified simply that the ACI has "all the egregious

deficiencies that could possibly exist". As Governor Noel informed the Legislature last year:

As a symbol, the current maximum security facility tells us a good deal about what is wrong. It is antiquated, in disrepair, and cannot support basic services. Time and events have left this brooding structure fixed, rigid, unresponsive; unable to meet the increasing demands of the passing years. And yet, tragically, ten decades after it was opened to admit 55 prisoners, nineteenth century architectural and penology concepts endure within a facility that now imprisons over 400 inmates.

That recurring conflict results is inevitable. The mere numbers of inmates forced together in intolerable living conditions would produce dire consequences in any group of human beings, let alone those being punished for crimes committed against society.

As a final note we might contemplate the fact that a substantial number of inmates confined in the maximum facility are classified by appropriate procedures, as prisoners capable of accepting responsibilities inherent in lesser securities; either medium, minimum, or work release. One can intuitively sense the frustrations and aggressions which inevitably must rise from such a fundamentally unjust administration of corrections and policies and facilities.

[Message of Governor Noel to a Joint Session of the Legislature, February, 1976].

### 2. Living Conditions in Medium Security

The Medium Security Building, housing approximately 160 prisoners in protective

---

**6.** It should be noted that Maximum Security is overcrowded, although not to the degree found in some reported cases. Ronald Brule, the Associate Director in charge of day-to-day management of Maximum, testified that the capacity of Maximum as of April 5, 1977 was 410, and that it carried on that day 407 inmates. He observed that operation at full capacity left him unable to transfer prisoners within Maximum to avert disputes and lessen violence. Also,

inmates needing protective custody are confined to segregation in Maximum, or placed with sick inmates in the infirmary, when Maximum operates at or near capacity. In general, commenting on the existing overcrowding of recreation areas, dining areas, and sitting areas, he stated that the present population level "makes the existing problems that much worse."

Brule Dep. at 3, pl. ex. 25.

custody status, presented conditions that, on balance, were not much better than those in Maximum. Prisoners are housed in three large dormitories and a cellblock. The building itself, dating from the depression period, is made of materials which can, with proper maintenance, be kept reasonably clean. The floors are of excellent quality, non-porous and quick-drying. Heating and ventilation present few problems; lighting was adequate. Windows were in good repair. But the walls were filthy; floors had not been swept. Due to inadequate management, the building is quickly deteriorating.

In the kitchen walls had spatterings of grease and dirt, as did the hoods over kitchen equipment. On my visit, the public health expert pointed out mouse droppings on food in open containers. As in Maximum, water outlets in the kitchen lacked vacuum devices, creating a danger that the entire potable water supply of the building could be contaminated by backed up wastewater. The good-quality tile on kitchen walls was cracked and fallen off in places from damage by carelessly-used push carts.

In the lavatories, pools of standing water gave off a stench of urine. There was mold and mildew on the showers, and the hot water pipes were exposed. The Department admitted that water from the shower leaks through the floor and into the kitchen, onto the food. On the Court's visit, many of the sinks and urinals were inoperable.

Housekeeping and maintenance had broken down in Medium in much the same way as it has in Maximum, and here the building itself cannot be blamed. Prisoners are denied requested cleaning supplies, without which it is impossible to maintain a minimum level of sanitation and cleanliness. For example, the mopheads observed by the Court on its visit were inadequate for anything more than spreading the dirt evenly across the floor. In Medium, as in Maximum, although some inmates are undoubtedly deficient in maintaining cleanliness in areas surrounding their beds which are

their responsibility alone, the basic responsibility for the massive default of minimum standards of sanitation and cleanliness is the Department's.

### 3. Classification; Fear and Violence

■ Classification is essential to the operation of an orderly and safe prison. It is a prerequisite for the rational allocation of whatever program opportunities exist within the institution. It enables the institution to gauge the proper custody level of an inmate, to identify the inmate's educational, vocational, and psychological needs, and to separate non-violent inmates from the more predatory. These goals are recognized by state law, which provides that classification shall serve a rehabilitative function.[7] Classification is also indispensible for any coherent future planning.

The classification process at the ACI is currently incapable of fulfilling any of its functions, and is inadequate under any minimum standards. It has deteriorated drastically over the past few years, and for all practical purposes has effectively ceased to function at all, contrary to the requirements of state law. Inmates are provided no psychological or psychometric examinations in the classification process, except in emergency cases. No written procedures exist to structure the classification process, which has been described by the Director of Classification as "informal" and "casual". State law is flaunted by the Department's failure to separate newly sentenced inmates from other inmates for an intensive classification process.

Central to the collapse of classification is the almost total disappearance of medium security as a classification status. Nearly 100% of the capacity of the Medium Security Building has been used since at least 1973 for protective custody inmates from Maximum. As a result, there is no room in Medium for medium security prisoners, and these prisoners are therefore classified maximum and sent to the Maximum Building. The Director of Classification, who

---

7. *See generally Morris v. Travisono*, 310 F.Supp. 857, 865 (D.R.I.1970).

has held that position since 1956, has stated that if he had a medium security facility, only between 50 and 75 inmates would need maximum security, instead of the over 500 inmates now in maximum security custody. The effects of this over-classification rebound throughout the system, to the incalculable detriment of the correctional process in Rhode Island. The Director of Classification noted, for instance, that the Classification Board is hesitant to grant inmates minimum custody status because the change from maximum is so great, a hesitation which an intermediate classification to medium would erase. He found that the long wait to change classifications was a direct cause of a substantial portion of violence at the ACI, for inmates believe that the wait to get into a lower custody (i. e., minimum) is so long it is not worth their while to stay out of trouble.

The classifications process as it presently exists serves no function at all. All entering inmates are classified as maximum custody, no matter what the length of sentence or characteristic of the offender. No attempt is made to determine the proper security level of an inmate on entry, nor his education, psychological, or vocational needs. Although there is a reclassification process, it, too, is a charade: to avoid raising hopes, the Department refuses to upgrade or change a classification unless the vacancy in a building or program is open, no matter what the inmate's changed needs or condition.

Rehabilitation, a goal of the correctional process in Rhode Island,[8] is impossible under the Department's approach, which is aptly characterized as "if we don't have it,

you don't want it."[9] Educational tests are administered only to those who specifically request them. No vocational tests are administered at all. The complete product of the initial classification is generally a three-sentence descriptive summary of each incoming inmate.[10] No plan is developed for each inmate.

The consequences of the failure of the classification system are manifold. First, it is literally impossible in the absence of adequate data for the Department to plan intelligently with a view to alleviating the problems that everyone recognizes as overwhelming. In early 1976, the Department concluded that the new Maximum Security Building planned ought to have a capacity for 200 high-risk inmates, a figure reached on the basis of the Director's "gut-feeling". When an architectural and planning firm conducted a closer study of the Department's needs, it was discovered on the basis of a more scientific study that the Director's gut-feeling estimate had been grossly overstated and that the needed capacity was less than half the original estimate. The Department accepted these conclusions and scaled down by one-half the capacity for maximum security inmates in its proposed new structure, yet unaccountably has neither adopted the classification procedures used by its own planners or altered its own, useless procedures.

The rampant violence and endemic fear of violence existing at the ACI are also direct consequences of the failure of the classification system. Classification is one of the cheapest ways to achieve a measure of security in a prison, enabling correctional

---

8. *See* R.I.G.L. § 42–56–1 (Supp.1976).

9. One witness, a 19-year old prisoner, has been at the ACI since April, 1976. He has never been given educational or psychological tests. He has had no physical examination. He has seen his counselor for two short visits since October 1976, and each time has been told that there are no programs for him when he requested something to do.

10. A review of prisoner files by one of plaintiffs' experts with great expertise in classification turned up the case of an inmate who had been diagnosed by a psychiatrist as having a

personality disorder. He was never provided any treatment for this condition while at the ACI. When he came up for parole, his application was denied because he had not received the care that was never provided for him. His file included a recommendation by a correctional officer that he be released because there was nothing the institution could do for him. Another correctional officer had no recommendation to make regarding this inmate but felt compelled to inform the parole board that this inmate had "a lousy personality."

officers to be placed where they are needed most. Yet, except by the crude method of granting all protective custody requests, victims are not separated out from predators at the ACI. In Maximum, over 420 inmates of vastly different experience and predatory potential, including lifers, pre-trial detainees, and newly sentenced inmates mix freely throughout the day. Inmates from various cellblocks must travel through other cellblocks to get to the medical facility, the dining room, the visiting room, and the recreation yard. Unless the prison were to undergo a permanent lockup, this situation is inescapable, absent an uneconomic reconstruction of the building. The most serious consequence of this commingling is probably the violence and sexual attacks which occur constantly throughout Maximum, and especially in the showers, which are virtually unguardable because of the blind corners behind which they are hidden. One expert reported finding a pair of bloody underwear in one of the shower rooms during a visit to the ACI.

The Court received extensive evidence of sexual attacks, and other violent incidents. One inmate testified that, shortly after his entry into the ACI in 1973 when he was 18 years old, he was gang-raped in the shower room in Maximum. Released from prison soon thereafter, he was reincarcerated in May, 1976. Within a month, he was again viciously sexually assaulted in a shower room, this time while he was in protective custody in Medium. In December, 1976, while living in a different dormitory in Medium, he was again gang-raped. He suffered a nervous breakdown. In March, 1977, he was denied parole for the sole stated reason that he needed psychiatric counseling—counseling which has never been provided him.

Contrary to what one might expect, Medium Security, housing the protective custody inmates, is little safer than Maximum. Many of the protective security inmates need protection from each other, and the Medium Security Building is therefore sealed into three compartments, each essentially a dormitory for 40 men. To keep each group of inmates from the other groups, each dormitory group must be locked in its dormitory for nearly the entire day. A review of the justifications for each inmate's protective custody showed approximately an equal number of rapists and rape victims afforded protective custody.

Of the 650 or so inmates at the ACI, 120 are currently in protective custody, and another 40 in punitive segregation. Many experts who testified at trial noted that the number of inmates in protective custody represented a percentage grossly out of proportion to any prison in America.[11] Each found this to be an indicator of the level of fear and violence pervading the ACI. Other evidence confirmed the fear and violence. A study of reported incidents of violence during 1975 and 1976 indicates approximately 155 assaults, rapes, and major fights per year; 330 other incidents of violence, and personal harm to inmates, or mutinous acts; 35 fires; and over 400 reported drug violations per year.[12] Prison officials estimate that 70–80% of inmates in Maximum are current drug users, including perhaps 40 heroin addicts. The traffic in contraband is a major cause of violence. There is no drug abuse program at the ACI.

Further review of the justifications proffered for placing individual inmates in protective custody makes it clear, as common sense dictates, that the true level of vio-

11. One expert testified that less than 3% of the men in the Maximum Security facility he had run for eleven years required protective custody or segregation. In Texas, only 1% of the 20,000 inmates require protective custody, a figure attributed to the wide-ranging industrial programs of the Texas Corrections Department. He also pointed out that other states, which like Rhode Island have only a single prison, have no more than one or two inmates in protective custody.

12. Less than two years ago, this Court recounted numerous incidents of physical violence at the ACI, which led prison officials to conclude that safety could be maintained only by a two-month lockup. See David v. Travisono, and Morris v. Travisono, 373 F.Supp. 177 (D.R.I. 1975). The level of fear and violence at the ACI is undiminished.

lence is grossly underreported. The Court received into evidence the collected reports of violence at the ACI from the Providence Journal-Bulletin from 1975–1976, a grotesque compendium of beatings, stabbings, fire-settings, and assaults. The image conveyed, to prisoners receiving the newspapers as well as the public, is that of an institution where violence is simply unchecked. The experts, without exception, agreed. The combination of a physical structure which is rife with blind corners and hidden shower areas, and which requires each group of inmates to pass through the area of other groups during the day, and the lack of classification has created an institution where no one is safe. The Director of Classification conceded at trial that the men in Maximum are in fear of their lives from physical harm or sexual harm, and that "because of the layout of the Maximum Security . . . it's impossible or difficult to protect these men." [13]

An additional contributing factor to the ever-prevalent fear and violence at the ACI is the inadequacy of the guard complement at the ACI. Witnesses who toured the ACI never observed more than two guards in any cellblock but the Behavioral Control Unit; a number incapable of providing a reasonable level of security to inmates. The Director of the Department confessed his virtual inability to control the inmates during any sort of disturbance in the institution short of locking them all up. Other department officials agreed, and observed further that the Department was prevented by its arrangements with the correctional officers' union from assigning qualified guards where they are most needed. Assistant Director Houle stated that he was forced, by the guards' union, against his judgment, to assign young and inexperienced officers to the most difficult posts.

In light of all the testimony, the Court finds that inmates exist in a state of constant violence and fear and that it is impossible for defendants to provide adequate protection to inmates at the ACI under the present classification system.

### 4. Program and Idleness in Maximum Security

The experts testifying at trial also stated, and the Court so finds, that it is impossible to maintain safety, discipline, and order unless a substantial portion of the population is constructively occupied, whether by work, education, vocational training, or recreation. Idleness in the ACI is perhaps the central fact of existence for nearly all inmates in Medium and Maximum at nearly all hours of the day.[14] It breeds boredom and a quest for excitement, and the defendants conceded that it is a major cause of the violence which has plagued the institution for years. This conclusion was reached by the 1972 Report of the Citizens Action Council to Governor Licht, and again in 1975 by the American Justice Institute. William Laurie, the Assistant Director of Corrections for Adult Services, the official with line responsibility for running the ACI, testified that the idleness among inmates has led to a loss of control by the Department. Yet he found himself incapable of remedying the situation, because both Maximum and Minimum simply have no adequate programming space. Plaintiffs' experts agree with Laurie's assessment of this problem.

Opportunities for work in Maximum are wholly inadequate by any minimum standards, a point conceded by the defendants. Although approximately 240 inmates ostensibly hold jobs, the level of idleness cannot be gauged by that statistic: as the Associate Director of Maximum Security admitted, each of these jobs could literally be completed in fifteen minutes. For example, the license plate shop is staffed to produce approximately 80,000 plates month-

13. Southworth Dep. at 67, pl. ex. 22. *See id.* at 60.

14. It is worth noting that Dr. Carl Clements, a court-appointed expert witness for Chief Judge Johnson in *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), found the idleness at the ACI even more extreme than that he had seen in the Alabama system condemned in *Pugh* as violative of the Eighth Amendment.

ly, but only 15,000 are required. It was estimated that the entire production run could be completed in two months of work a year. The effect of this situation on the work attitudes and habits of inmates can hardly be overestimated. One inmate testified that he managed to secure two jobs, which could both be completed in a total of fifteen minutes. When the authorities learned of this hoarding, they took the second job away, so that work could be more evenly spread around the population.

There are approximately 65 positions in the three state-use shops in Maximum. Eleven prisoners work at a prisoner-initiated and non-state funded motorcycle repair shop. Other prisoners have attempted to set up other shops, purchasing necessary equipment with their own funds, only to be finally refused permission after months of indecision from the Department. Another 54 inmates in Maximum have non-industry jobs—lawn mowing, kitchen work, and the like. The rest of the jobs are simple clean-up, for which the cleaning materials provided prisoners are completely inadequate.

The level of idleness is exacerbated by the paucity of educational or vocational training opportunities.[15] There is only one vocational training program for the entire maximum security program, a 16-week graphic arts program with a capacity for 10 inmates and 1 or 2 auditors at any one time. Because of inadequate funding, the program often stops for a few months. Again, some inmates who have tried to teach themselves trades have been thwarted by officials denying them permission to purchase tools with their own funds.

Only four individuals spend most of their time teaching inmates at the ACI; only one of these is funded by Rhode Island. Only 29 prisoners attend the Adult Basic Educational Program in Maximum Security. Two afternoons a week no classes of any sort are conducted. The reading specialist sees only approximately 10 prisoners per week in Maximum, 6 per week in Medium. There

are rarely more than 20 prisoners attending class in Maximum at any one time.

Three experts with wide experience in managing and studying prisons testified that they had never seen more than 10 prisoners in class during any of his tours, and that nothing appeared to be going on in the classes which were in session. As one expert noted, "the classrooms showed every evidence of disuse." Each testified that the quality of the instruction appeared to be extremely poor. Each testified that, in their experience, substantial numbers of prisoners will participate in institutional educational programs of good quality. As the plaintiffs note, the inadequacy of the educational programs at the ACI, and the resulting idleness and potentiality for violence, have been emphasized by every group that has studied the ACI since 1972.

The deadening effect of a nearly complete lack of constructive work, vocational, or educational opportunity is made worse by the grossly inadequate recreation facilities or programs. The indoor recreational facilities, which must house the entire recreational program for a significant part of the year, are inadequate by any standard. *No* indoor facilities are available during weekdays in Maximum. One of the two rooms made available after the evening meal is too small and low-ceilinged to permit basketball or jogging or any active sports. It contains a pool table, some weights, and a boxing ring. The other exercise room in Maximum is available when it is not being used as a chapel or as a theater. It is large enough to accommodate ten men playing basketball, and nothing more.

5. *Program and Idleness in Medium Security*

In nearly every relevant respect, the approximately 160 inmates in protective custody are subjected to a regime of idleness more complete, and more devastating, than that suffered by prisoners incarcerated in

---

**15.** In a 1975 report for the Law Enforcement Assistance Administration, the American Justice Institute concluded that the lack of pro-

gram activity for the more than 100 protective custody inmates was "inexcusable."

the Maximum Security building. These inmates have not committed disciplinary violations, and their placement in protective custody is not intended as punishment. They literally fear for their lives, and in return for a measure of safety have been forced to bargain away a substantial part of the already meager program activity available to inmates in the general population. Worse, protective custody inmates are deprived of any semblance of personal privacy. They live in dormitories of 40 men, a practice condemned by experts for any but minimum security inmates.

There are no vocational training programs for protective custody inmates. Only the six inmates who work in the upholstery shop and the garment shop hold jobs requiring any skill or offering opportunity for constructive vocational growth. These jobs are scheduled for four hours daily, but are done in much less time. The other inmates theoretically hold maintenance jobs. It was undisputed that these "jobs" can be completed in only fifteen minutes and are rendered even more farcical by the lack of basic adequate cleaning equipment such as soap and mop.

Prisoners in different protective custody dormitories are not permitted to attend classes with each other. As a result, no prisoner may attend class for more than 4 half-days a week. In one dormitory prisoners are not permitted to attend classes at all. Other inmates, who attend classes for about 7½ hours a week, are not permitted to participate in any other program activity, including work.[16] Provision for recreation or physical exercise in Medium is wholly inadequate. There is no organized recreation program for inmates in protective custody. Nor is there any indoor exercise facility. The room designated for indoor exercise is in the basement, too low-ceilinged and small to permit basketball or any other physical activity, save pool, pingpong, and table games. There is no weight-lifting equipment. During the long winter months, or in inclement weather, prisoners are permitted to use this room for a half hour a day. The recreation program and opportunity for exercise are inadequate under any minimum standards, including the minimum standard set by the Department's own regulations.

In short, inmates in protective custody suffer almost total idleness. On my visit to the ACI during this suit, I was besieged with complaints about the absence of any constructive program by the men in one of the protective custody dormitories, who were all sitting around with nothing to do on a warm, April day. They are, quite literally, warehoused. William G. Nagel, a noted expert on corrections, present Director of the Institute of Corrections of the American Foundation, and for eleven years the deputy superintendent of the New Jersey Correctional Institution at Bordentown, testified that the idleness suffered by protective custody inmates was different not only in degree, but in kind from that normally entailed by incarceration in America.[17] He found it more complete than he had ever observed in an American prison. He pointed also to the total lack of privacy for inmates in protective custody, their total lack of protection from the other thirty-odd men in each dormitory, the high level of fear at night, and the incessant noise. His expert opinion, joined by other witnesses and uncontradicted, was that the debilitating conditions are so extreme that inmates in protective custody deteriorate while so incarcerated. "I don't know what is more punishing than letting a person rot," he concluded. The Court credits this testimony.

### 6. Pre-trial Detainees

In recent months, the number of pre-trial detainees has varied from between 120 to

---

16. One inmate testified to his daily schedule in protective custody. Except for three fifteen-minute meals (at 8:45; 12:30; and 3:30), he spends all his time in his dormitory, a room about the size of an average courtroom, in the company of 40 other inmates, playing cards and watching television. This includes the stretch from 4 p. m. to 11 p. m.

17. Among his other positions, Mr. Nagel served as a consultant to the Department of Justice from 1970 to 1972 visiting 103 correctional institutions across the country.

175. Because the awaiting trial (AT) cellblock in Maximum can house only 99 inmates, there are nearly always awaiting trial inmates housed in protective custody, the Behavioral Control Unit (B.C.U.), the hospital area, and the main cellblocks in Maximum.

Even for those pre-trial inmates housed in AT, there is constant daily contact with sentenced inmates. They must pass through the South State cellblock to eat, to go outdoors, to the commissary, to the medical facility, or to meet visitors, for example. They have no separate recreation facilities, nor separate shower facilities. Shower facilities used by AT inmates are freely used by inmates from all sections of Maximum during the day, and they are not visible to a person standing anywhere but directly in front of the showers. There were no guards positioned near the showers used by awaiting trial inmates during any of the numerous visits of witnesses at trial.

This intermingling of the awaiting trial inmates with the general population has been described by the Associate Director of Maximum Security as a major security problem. He noted that the pre-trial detainees suffer most of the violence, and that they are "often the victims of homosexual acts from the state population, theft, you know."

Because pre-trial detainees are not classified in any way, no attempt is made to determine which detainees need maximum security confinement or whose presence would be adequately guaranteed for trial by incarceration in Medium or Minimum custody. Nor are any pre-trial inmates screened for mental health problems or program needs. Indeed, they are forbidden from participating in any of the educational, vocational, or work opportunities that do exist. They can earn no money, and are not permitted to occupy themselves with constructive activity.

In short, pre-trial inmates are exposed to conditions worse than those suffered by sentenced inmates in either Maximum or Medium. Nor can the state plead that this intermingling is caused by any sort of emergency conditions. Over the past five years, the situation has been repeatedly called to the attention of the officials responsible. See American Justice Report to Governor Noel (1975); Report of the Committee to Investigate the Uprising at the Maximum Security Facility of the Adult Correctional Institution on April 2, 1973 (1973); Report of the Citizens Action Council on the Adult Correctional Institution to Frank Licht, Governor of the State of Rhode Island (1972).

The conclusion is inescapable that pre-trial inmates are not provided minimally adequate protection against assault, that they are exposed to punishment even worse than that endured by other inmates, and that they are incarcerated under conditions far harsher than anything necessary to guarantee their presence at trial. So long as pre-trial inmates are housed in Maximum Security, these conditions cannot be significantly improved.

### 7. Drug Abuse and Treatment

The extensive availability and use of drugs inside the ACI is a substantial cause of violence between inmates, and defeats the Department's efforts at securing an orderly institution. Rehabilitation in an environment where 70% or more of the inmates are abusing drugs, as at the ACI, is obviously impossible. The ACI's facilities and program for diagnosing and treating drug addiction are wholly inadequate. The deliberate indifference displayed by the defendants to the serious medical needs of drug dependent inmates leads to unnecessary and inevitable suffering.

Dr. Anthony Raynes, a psychiatrist with extensive expertise in the field of drug addiction treatment and diagnosis in correctional settings, who has previously consulted for the ACI, noted that the records maintained by the Department in connection with drug abuse diagnosis and treatment were completely inadequate in terms of history taking, notation of physical symptoms associated with drug abuse, treatment provided, and follow-up. Screening procedures were seriously deficient. No

in-house drug tests were available, and the time required for tests performed on incoming inmates to be returned from Boston laboratories substantially reduces the value of those tests. As a result, many prisoners are misdiagnosed and physical and mental deterioration associated with certain forms of drug abuse continue unabated and even unnoted.

Because its record-taking is so inadequate, the Department is unable to ascertain the extent of drug usage at the ACI. A study performed for the Department in 1975 found that between 15 and 40 inmates at the ACI maintain themselves on heroin inside the institution; another 70–80% of the population abuses drugs at any given time. Dr. Donahue, the chief physician at the ACI, estimates that perhaps 50–70% of inmates resident at the ACI are drug-dependent. He believes that the same proportion of inmates enter the ACI as drug-dependent.[18] The Court received the appalling testimony, uncontradicted by anyone, that much of the drug traffic originates with the guards. The ACI also has a significant number of inmates using a number of drugs (poly-drug users) at any given time, although the Department has no reliable figures on the extent and combinations of drugs, and alcohol, used. Of course, it is impossible to design treatment resources without these statistics, even if inmates were properly screened and diagnosed, which they are not.

The medical staff has no formal protocols for the withdrawal or treatment of heroin, barbiturate, or poly-drug users, nor even commonly understood unwritten policies.

Dr. Donahue informed Dr. Raynes that he believes in waiting for symptoms, and then treating symptoms (often with tranquilizers and emetics), a method of treatment which Dr. Raynes likened to treating a patient with leeches. In Dr. Raynes' expert opinion, which is unrebutted, Dr. Donahue is either unable or unwilling to follow current medical practice regarding chronic or acute reactions to drugs. Detoxification is unavailable either for heroin addicts or for inmates who had recently been maintained on methadone. Addicts are provided no drug counselling,[19] nor are inmates already admitted to the ACI screened to detect continuing drug usage with a view to effective treatment. On the basis of his conversations with medical personnel at the ACI, Dr. Raynes was able to state with assurance that it is impossible to provide adequate medical treatment for drug users in the ACI with current personnel, attitudes, and knowledge.[20]

The failure properly to identify or treat drug users in the ACI has a devastating impact on the entire inmate population. Of most obvious importance, much of the violence rampant at the ACI is related to the drug traffic which occurs within the walls of the institution. There is increased risk of suicide gestures, and increased pain and suffering on the part of inmates addicted while ostensibly under the secure custody and control of the state.[21] And because drug addiction acts like an infectious disease, with one addict commonly "infecting" a number of other unaddicted persons each year, there is a real risk that non-addicted

18. Dr. Raynes compared these figures with the extent of drug usage at the Massachusetts Correctional Institution at Walpole. In April 1976 he found only two current heroin addicts at Walpole, and current drug abuse among 10–15% of the population.

19. The Court received some evidence showing that a drug treatment facility is in the planning stage. See pl. ex. 5C. However, there was no indication that any treatment has actually materialized, nor that it will solve the problems documented at trial.

20. A report prepared for the Department in early 1977 specifically recommends that Dr.

Donahue be excluded from participation in any drug treatment program:

. . . the current physician seems unable or unwilling to diagnose or respond therapeutically to the drug abusing inmate.

The report cited "the ACI's inadequate and inappropriate medical response" since the outset of planning for improved drug treatment at the ACI. See Report on Training and Technical Assistance, Rhode Island Department of Corrections (1977), pl. ex. 5(c) at 5.

21. Hepatitis is another expected, and present, result.

inmates will become addicted while incarcerated. Finally, a matter which may be of little constitutional significance but of great consequence to the citizens of Rhode Island, this pattern of failure leads inexorably to the release of seriously addicted inmates who will maintain their habits by renewed criminal activity.

### 8. *Medical Care*

The Court received extensive testimony regarding the delivery of medical services to inmates at the ACI. Here again, a series of reports commissioned by the Department over the past four years describes, highlights, and reiterates the life-threatening deficiencies which have plagued the medical services staff in the past. It appears that some effort is finally being made to take steps to improve care which as recently as 1976 was described as "fragmented" and "episodic" and "minimal." However, the unrebutted, credible testimony of plaintiffs' two experts in the delivery of medical services in a correctional setting leads inexorably to the conclusion that the system of medical care delivery at the ACI is inadequate by any accepted standard to meet the inmates' routine and emergency health care needs.[22] In light of the fact that the Department has been aware of this dangerous situation since 1973, the Court finds that the defendants have consciously disregarded a grave and substantial risk to the health and well-being of the inmates entrusted to their care, in the form of the needless occurrence, prolongation, or exacerbation of serious injury, illness, or suffering.

It is true, as the defendants assert, that there has not been in recent years a serious outbreak of infectious disease, nor have the plaintiffs attempted to prove specific instances where the illness or injury of a particular inmate was exacerbated by the deliberate indifference of staff members. Neither of these facts is determinative. Given the dangerously low standard of medical care that prevails at the ACI, the Court would be remiss in its duty were it to wait until an inmate bleeds to death, or suffers a heart attack which defendants are unequipped to diagnose or treat in an emergency, before it acts. Inmates are wholly dependent on the medical services staff for their medical needs. Unlike the general population, they cannot self-treat even the most minor ailments, nor do they have the privilege of making their own choice of physicians. The Department of Corrections is fortunate that the ACI, situated adjacent to the state medical center, can use that facility with a fair degree of ease in certain situations. But the frightening fact remains, that the ACI medical care system is simply unable to provide satisfactory emergency service or satisfactory routine care for the inmates. Indeed, Dr. Lambert King, the Director of the prison hospital at the Cook County Correctional Center in Chicago and a physician of extensive experience in managing a medical service in a correctional setting, testified that the medical services provided at the ACI were inferior to any correctional medical services he had ever inspected. Without going into extensive detail, the following deficiencies display the extent of the problem.[23]

The infirmary has no capability of performing elementary blood or urine tests, which are crucial for quickly diagnosing commonly encountered medical problems among inmates for which prompt diagnosis is essential. The infirmary has no centrifuge, and blood counts cannot be performed. The Department was advised as early as 1973 that such tests were the first priority in an upgraded system. There is no electrocardiogram at the ACI, and as a result medical staff cannot make an ade-

---

**22.** Defendants made no attempt to counter plaintiffs' expert testimony with experts of their own. They did call the recently hired Medical Services Administrator. While the Court was not unfavorably impressed with this individual and is sympathetic to his attempts to bring some order to a system that badly needs it, he did not qualify as an expert on the subject of medical standards and thus could not enlighten the Court on that subject.

**23.** *See also* the description of sanitary conditions in the infirmary at page 963, *supra*.

quate emergency diagnosis of an inmate having chest pains. The infirmary is not equipped to take specimens from wound infections for culture or sensitivity tests, nor is there any means of performing tests for gonorrhea. As an inevitable result of these deficiencies in laboratory testing capability, inmate medical problems are likely to go undiagnosed, and the efficacy of any treatment administered cannot be competently evaluated.

The institution is missing certain essential emergency equipment such as a defibrilator for the treatment of coronary problems and suction equipment for the removal of secretions from a windpipe to aid a choking patient.

The size of the medical staff is inadequate by the Department's own admission. The Department has one full-time doctor, who in practice works fifteen hours a week but is paid for forty hours' work. At present, he has stopped work completely, apparently due to a disagreement with the Department. Two part-time physicians work approximately 24 hours a week. The medical staff is expected to provide physical examinations (these have recently been made more thorough) to all incoming inmates. They are also responsible for the other medical needs of 650 inmates who, because of the excessive violence at the institutions, require a good deal of patching up. Necessarily, much of the burden of treatment falls on the nursing staff, an expedient that is medically unobjectionable provided there is adequate supervision. In practice, however, necessary training and guidance for the nursing staff is almost ` totally lacking, a situation which constitutes reckless disregard for, and deliberate indifference to, the medical needs of inmates.

For example, medications which outside the institution routinely require a physician's prescription are generally dispensed at the ACI by nurses, based on their own interpretations of patient needs and without physicians' orders. Physicians are not consulted or informed before potentially harmful medications, including tranquiliz-ers and antibiotics, are administered. These practices violate the standards for institutional health care delivery of the American Public Health Association, and the unrebutted testimony of Dr. King was that they are likely to result in serious injury to inmate patients. In addition, nurses, on their own, without physician approval and without guidance by written instructions or policy, sometimes decide that some patients' complaints are imaginary and treat them with placebos.

Although the nursing staff are the only medical personnel available outside of normal working hours, they are not provided with guidance for use in commonly occurring emergencies. They are not trained in cardio-pulmonary resuscitation for supporting respiration or circulation in cases of cardiac or respiratory arrest. There are no protocols or in-service training programs concerning the emergency treatment of inmates with seizures, drug overdoses, or exposure to teargas or other chemical control agents. Although nurses are authorized to use sodium luminol in the emergency treatment of epileptic seizures, they are provided no guidance in the use of this medication, notwithstanding the risk that its use with other-than-epileptic patients carries a serious risk of death. Dr. Donahue's opinion that training for sodium luminol and other treatments mentioned above is unnecessary was contradicted by the more credible testimony of Dr. King, holding that the lack of such guidance fell far below acceptable medical practice. Dr. Donahue does not even know the types of gas available at the ACI, such as mace, and, of course, he has not planned in any way for treatment of its side-effects. Although he has instructed the nursing staff to call him if they have a problem while he is not at the ACI, on numerous occasions attempts to reach him have been unsuccessful.

No written agreement exists between the Department and a mobile rescue unit, and there is a continuing substantial risk that delay resulting from difficulty in arranging transportation could, in cases such as heroin overdoses, cause the death of an inmate.

Even more shocking, there is no disaster plan prepared by the physician in charge of medical services at the ACI, although this is a commonly accepted practice in correctional institutions.[24]

The ACI employs no pharmacist and maintains no formulary, violations of minimum standards that render impossible the compilation of meaningful data on medication usage at the ACI and increase the difficulty of controlling diversion of medication for improper use.

The infirmary is similarly deficient in coping with inmates suspected of having infectious diseases, such as hepatitis or tuberculosis, and a substantial risk exists that an outbreak may occur. No written procedures exist for staff guidance. No provision is made to administer gamma globulin to inmates who may have been exposed to hepatitis, a failure which the Court is advised is unacceptable medical practice. Rooms set aside for infectious patients are wholly inadequate to contain disease: they have neither doors, nor separate ventilation systems, nor separate toilet facilities, and infectious patients must walk through the general infirmary area. In one case, medical staff were not even advised by the physician that an inmate placed in the "isolation" area was suspected of having hepatitis. All of these deficiencies in staff, equipment and procedures are exacerbated by the lack of organization that characterizes the medical services system as a whole, a failing which in addition renders less effective any strong points that the system might have. Under the present chaotic regime, staff performance is not evaluated, written guidelines as to how the service will operate are non-existent, and there are no written plans or instructions available on how to use the outside medical facilities upon which the ACI is heavily dependent. Indeed, there is not even a check made as to whether staff licenses are current. All of this, of course, results in inappropriate and haphazard treatment, as plaintiffs' expert

testified, and great risk of prolonged or exacerbated illness or injury.

The lack of system is perhaps best illustrated by the near total lack of available statistical information. When the trial of this case started last April, there were *no* statistics available about any aspect of health care at the ACI, not even such basic information as the type or quantity of medication prescribed for common health problems or the number of inmates with diabetes, asthma, or tuberculosis.

While the Court received testimony in late May that this situation had been partially remedied, and that the new Medical Services Coordinator, John Fournier, has recently begun devising forms and keeping statistics, the Court has no indication of the extent or adequacy of these improvements from any qualified witness. Instead, the unrebutted testimony showed that the cumulative effects of the deficiencies noted in the medical care system lead directly to increased morbidity and to the prolongation of disease, and result in a clear and every-present danger that emergency situations will not be treated properly. It was Dr. King's opinion that the medical services system, as it was set up at the time he testified, may result in unnecessary death, and met no minimum standards for delivery of health care in a correctional setting.

Based on the undisputed testimony of a number of well-qualified witnesses, the Court also concludes that psychiatric and psychological evaluations and treatment are inadequate to meet the needs of the inmate population. Dr. Carl Clements, a psychologist who consulted for Judge Johnson in *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala. 1976), reviewed a number of records and testified about one he believed was typical. An inmate who had suffered a nervous breakdown after eight months in the ACI was denied parole on March 30, 1977 for the stated reason that he "had serious problems with drugs, behavior in the community, and mental instability. . . . You need psy-

---

24. After this obvious and most dangerous deficiency was pointed out by plaintiffs during trial, defendants hastily devised a preliminary version of a disaster plan that they claim will be instituted soon.

chiatric counselling." This callous comment is particularly shocking in light of the fact (which can hardly have escaped the Board of Parole) that the ACI employed no clinical psychiatrist or psychologist, and had no arrangements to provide such treatment to any inmates. Other experts noticed a number of inmates acting out, as did the Court on its visit. Dr. Clements found the mental health facilities inadequate according to standards promulgated by the Federal Bureau of Prisons and the American Correctional Association. Although the Court received testimony that a psychiatrist would finally be employed in the near future, a memorandum issued by the Coordinator of Counseling Services casts serious doubt on whether that individual, if indeed he is every hired, will engage in treatment. Written recommendations for parole hearings and intake evaluations are set out as the top priorities.

The Court is not unaware that, as litigation commenced, some improvements in medical care were begun. Intake physical examinations are now more thorough, for example, and, as indicated, an attempt to keep statistics is now being made. These efforts are commendable, and the Court applauds them, but they are simply insufficient to cause the Court to alter its firm conviction that, on the record before it, the level of medical services provided at the ACI falls below any minimum standards and creates an unacceptable risk of needless suffering and disaster. There will be time enough to alter this assessment if, as everyone hopes, conditions take a significant turn for the better.

9. *The Cumulative Impact of Conditions at the ACI*

The comprehensive pattern of neglect in every area, and overcrowding, has a cumulative psychological impact on the inmates confined at the ACI.

Neither Maximum nor Medium presents the massive overcrowding of inmates which has been documented in other cases.[25] Inmates are provided with the generally ac-

cepted minimum of 60 square feet of cell space, or 75 square feet of dormitory living space, per inmate. However, the ACI suffers from overcrowding of a different sort, for it is incapable of meeting the classification, protection, program, or fire safety needs of the population.

Even if prisoners were classified properly, there is insufficient space to keep various groups apart, a necessity for the protection of inmates from violence. Associate Director Brule noted that his inability to shift inmates to empty cells within buildings, and between buildings, has made it increasingly difficult to control inmate disputes. Protective custody inmates in Maximum are forced to do without exercise or visits for a period of two weeks or more and may be placed in the hospital area in close proximity to inmates with serious infectious diseases. As previously noted, lack of any space for medium security inmates has led to gross over-classification of most inmates, resulting in increased levels of fear and violence and foreclosing any opportunity for enhancement or even maintenance of constructive attitudes.

The defendants conceded that lack of programming space was a serious problem, and have emphasized in each of their new plans greatly increased programming space. Recreational space, as well as space for educational and vocational programs, is at present wholly inadequate, and contributes substantially to the nearly total lack of program activity for inmates in Maximum and Medium, where the situation is even worse.

Finally, pressure on inmate capacity currently requires inmates to be housed in upper tiers with only a single means of egress, a situation which violates all accepted fire safety requirements and can only be described as a tragedy waiting to happen.

Even if there were additional programming space at the ACI, which there is not, an attempt to provide adequate education, vocational, and work experiences for those willing to take advantage of them would be

**25.** *But see* n. 6 *supra.*

doomed to failure. The institution is presently unfit for human habitation. Inmates are subjected to constant fear and violence. They become withdrawn and anxious, and increasingly incapable of any healthy social interaction. In these circumstances, rehabilitation is impossible. Subjected to near-total idleness in unsanitary living conditions, it is in fact nearly impossible for an inmate to conserve and maintain whatever constructive attitudes and life skills he may have had on entry. Dehabilitation, the mental and physical deterioration of inmates, rather than rehabilitation, is inevitable. The Court finds, on the basis of undisputed and credible testimony, that deterioration is presently taking place.

The Court received extensive testimony on the physical capabilities of the present structures, including detailed analysis from the architect and planner retained by the Department. It was conceded at trial by the defendants, and the Court finds, that the Maximum Security Building has outlived its usefulness. It is incapable of being safely used for any group of inmates requiring security control, or indeed even for more than 300 minimum security inmates who work all day in outside-the-prison programs. The Maximum Building is incapable of any use for any number of inmates without jeopardizing their physical health and safety without massive reconstruction, which it is agreed by all is financially unfeasible. The Department's own architect gave his opinion that Maximum is useful only as a warehouse, which, indeed, it has become.

### 10. The Defendants' Response

The defendants' response to this bleak picture was a mixture of concessions, promises, and half-hearted objections.[26] For example, they pointed to the number of inmates holding jobs, but did not dispute that no job takes more than fifteen minutes to complete. They demonstrated that classification counsellors are available to inmates from Monday through Friday, but admitted

that maximum is the only real classification for more than ⅚ of the inmates confined to the ACI. Prisoners were blamed for the housekeeping deficiencies, and it was stressed that inmate porters (cleaners) were paid two dollars a day nonetheless; yet the state conceded that the simple motivation of withholding wages for work not completed had never been considered. Beyond this, defendants' response to plaintiffs' overwhelming evidence of neglect was limited to renewed promises of reforms, which would arguably have occurred in any case when Maximum is replaced by a new building, as defendants concede it must be.

■ Defendants' response raised serious doubts in the Court's mind as to their capacity to undertake the Herculean task of rebuilding the Rhode Island prison system. Plaintiffs' extensive testimony on this subject did nothing to dispel these doubts. On the contrary, the experts were unanimously agreed, and the Court finds, that there is a complete absence of effective leadership or management capability on the part of the responsible officials. The problems catalogued herein are not new; they have been highlighted by a succession of advisory commissions and paid consultants, engaged by the Governor or the Department to untangle the reasons for the collapse of an effective, orderly, humanly habitable prison in Rhode Island.[27] The findings of each of these studies admitted into evidence, have been reconfirmed and underscored by the evidence presented at trial.

The present Director of the Department of Corrections has been in office for more than a year. During that time, no vocational programs have been instituted, nor are any realistically planned. Although the massive drug problem at the ACI has been exhaustively documented and analyzed for years, no drug program yet exists, and the planned facility is designed only for inmates nearing the completion of their sentences; it was designed on the basis of physical space available, rather than need. No changes in classification have been insti-

---

26. See note 1 supra.

27. See, e. g., the reports cited ante, at 971.

tuted, or proposed. No indoor recreation facilities in Medium have been proposed. No proposals have been made to remedy the lack of effective maintenance or housekeeping. The Director has testified that he wants to close down Maximum by mid-1979, to use Medium exclusively for pre-trial detainees, and to place the remaining population in other buildings. He cites recent reports that he has commissioned showing that it would be excessively costly to bring the present Maximum Building up to what he himself termed "minimum standards of living".[28] Thus, it is argued, the Court should stay its hand, and let the Department work out its own plan.

As a factual matter, the Court cannot accept the Department's sanguine prognosis for the future of the ACI under its present management. If conditions at the ACI were less barbaric, if this Court were writing on a clean slate, it might be otherwise. But the record in this case is replete with plans that have never materialized. The Department's current plan for the future of the ACI, as it emerges from the evidence presented to the Court, differs totally from the plan in effect just one month before trial. It is vague and hastily drawn [29] and is more accurately described as a compendium of hopes and wishes than as a realistic guide to future conduct. While some of defendants proposals undoubtedly have merit, the plan as a whole provides no reason to depart from the conclusion reached by plaintiffs' experts that the present management of the ACI is basically incapable of creating a safe, orderly, and hygienic prison to accomplish the state's twin goals of custody and, where possible, rehabilitation.

## II

### 1.

▮ Federal courts are properly reluctant to interfere with the operation of state prison systems. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). This restraint is derived in part from jurisdictional statutes which authorize intervention only on the basis of federal constitutional violations, and in part from notions of comity and due regard for the states' sovereignty over their own internal affairs. In addition, as the Supreme Court has advised and as this Court is deeply aware,

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.

*Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (footnote omitted). Nevertheless, "there is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); *Pell v. Procunier, supra; Holt v. Sarver*, 309 F.Supp. 362 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971); *Martinez Rodriquez v. Jiminez*, 409 F.Supp. 582 (D.P.R.1976), *stay denied* 537 F.2d 1 (1st Cir. 1976). Prisoners retain all those rights enjoyed by free citizens except those necessarily lost as an incident of confinement. *Pell v. Procunier*, 417 U.S. at 822, 94 S.Ct. 2800; *Pugh v. Locke*, 406 F.Supp. 318, 328 (M.D.Ala.1976).

---

**28.** Southworth Deposition at 24, pl. ex. 22.

**29.** For example, after a new Maximum facility is built, defendants expect to house the remaining population in the present Medium Building and in other currently existing structures at the ACI's Cranston complex. Since the completion of the new Maximum is less than two years away, according to defendants' timetable, one would expect that blueprints, cost estimates and the like for the renovation of existing structures would have been prepared. No such detailed plans exist, however, and thus the Court cannot say with any certainty that defendants' plan is realistic or even possible, much less acceptable.

When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights. *Procunier v. Martinez*, 416 U.S. at 405–06, 94 S.Ct. at 1807.

■ Officials who engage in massive, systemic deprivations of prisoners' constitutional rights are entitled to, and can expect, no deference from the federal courts, for the constitution reserves no power to the state to violate constitutional rights of any citizens. *Newman v. Alabama*, 349 F.Supp. 278 (M.D.Ala.1972), *aff'd in part* 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974); *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); *Pugh v. Locke, supra.* Nor can lack of funds, or invocations of the virtues of the legislative process, excuse constitutional violations or judicial default. To the contrary, the constitutional prohibition against cruel and unusual punishment, like other provisions of the Bill of Rights, was designed expressly to protect the weak and powerless from the passions, or the reckless neglect, of the majority and its leaders.

On the factual record adduced in these cases, the Court has a clear duty to require the defendants to remedy the constitutional violations which plague the Adult Correctional Institutions in Rhode Island. The necessity and continuing responsibility for state officials to exercise broad discretion in maintaining order and security cannot justify judicial abdication from the enforcement of basic constitutional rights of inmates to a reasonably safe and sanitary environment, and to be free from conditions which inexorably cause their physical and mental deterioration. This case is not an exercise in making prison life more pleasant for prisoners, nor is the ACI about to be transformed into a Holiday Inn. The conditions under which inmates in Rhode Island exist

shocked the Court, and the Court is convinced that they would shock the conscience of any reasonable citizen who had a firsthand opportunity to view them. The defendant state officials, to their credit, made absolutely no attempt to justify these conditions by reference to any penological goals. It would have been impossible had they tried. Conditions at the ACI are inconsistent "[with] the evolving standards of decency that mark the progress of a maturing society". *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). In effect, each prisoner sentenced to a prison term in Rhode Island, or sent to the ACI awaiting trial, is sentenced to a regime in which he will be forced to live in a state of constant fear of violence, in imminent danger to his bodily integrity and physical and psychological well-being, and without opportunity to seek a more promising future.

2.

■ The evidence is overwhelming that the totality of conditions of confinement in Maximum and Medium do not provide the "tolerable living environment", *Rhem v. Malcolm*, 371 F.Supp. 594, 627 (S.D.N.Y.), *aff'd* 507 F.2d 333 (2d Cir. 1974), that the Eighth and Fourteenth Amendments require for state prison inmates. *Compare Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1974); *Holt v. Sarver*, 442 F.2d 304, 308 (8th Cir. 1971); *Mitchell v. Untreiner*, 421 F.Supp. 886, 896 (N.D.Fla.1976); *Pugh v. Locke*, 406 F.Supp. at 329; *Hamilton v. Schiro*, 338 F.Supp. 1016, 1019 (E.D. La.1970). The lack of sanitation, lighting, heating, and ventilation, and the noise, idleness, fear and violence, and the absence or inadequacy of programs of classification, education, physical exercise, vocational training or other constructive activity create a total environment where debilitation is inevitable, and which is unfit for human habitation and shocking to the conscience of a reasonably civilized person.[30] *Pugh v.*

---

30. Defendants argue that the mere fact that conditions at the ACI do not meet the minimum standards set by the relevant professional and governmental bodies and testified to by plaintiffs' experts does not mean that the ACI fails to comport with constitutional minima. While this may be true under some circumstances, *see Williams v. Edwards*, 547 F.2d 1206, 1214

*Locke*, 406 F.Supp. at 329; *Holt v. Sarver*, 309 F.Supp. 362, 372–73 (E.D.Ark.1970), aff'd 442 F.2d 304 (8th Cir. 1972). *See Trop v. Dulles*, 356 U.S. at 100–101, 78 S.Ct. 590. *See also Williams v. Edwards*, 547 F.2d at 1214 (lack of sanitation); *Miller v. Carson*, 401 F.Supp. 835, 900 (M.D.Fla.1975) (exercise); *Battle v. Anderson*, 374 F.Supp. 402, 424 (E.D.Okl.1974) (same); *Rhem v. Malcolm*, 371 F.Supp. 594, 626–27 (S.D.N.Y.), aff'd 507 F.2d 333 (2d Cir. 1974) (same); *Rozecki v. Gaughan*, 459 F.2d 6, 8 (1st Cir. 1972) (heat); *Hamilton v. Landrieu*, 351 F.Supp. 549, 554–55 (E.D.La.1972) (ventilation, light); *Pugh v. Locke*, 406 F.Supp. at 330 (lack of constructive programs). These conditions of confinement serve no legitimate correctional purpose, *Pell v. Procunier*, 417 U.S. at 822–23, 94 S.Ct. 2800; *see O'Brien v. Moriarty*, 489 F.2d 941 at 944, and are so far beyond the pale of civilized standards that they would be unjustified even if they did serve some such purpose, *see id.*

3.

It is likewise clear from the facts adduced at trial that defendants, by failing to provide reasonably adequate protection for the inmates, have knowingly and recklessly permitted a reign of terror to develop and exist at the ACI. Inmates are forced to live in constant fear of violence and sexual assault. Although defendants are not insurers of inmate safety, the layout and present staffing patterns at the ACI, and the opportunities produced by enforced idleness, create a situation where control is non-existent. The Eighth Amendment forbids the continued existence of such conditions. *Little v. Walker*, 552 F.2d 193 (7th Cir. 1977); *Finney v. Arkansas Board of Corrections*, 505 F.2d 194 at 201; *Gates v. Collier*, 501 F.2d 1291, 1308–09 (5th Cir. 1974); *Holt v. Sarver*, 442 F.2d 304, 308 (8th Cir. 1971); *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973); *Martinez Rodriguez v. Jiminez*, 409 F.Supp. 582, 594 (D.P. R.1976).

4.

■ The record in this case is replete with evidence that prison officials have never given meaningful content to the policy of the Rhode Island legislature that "efforts to rehabilitate and restore criminal offenders as law-abiding and productive members of society are essential to the reduction of crime," R.I.G.L. § 42–56–1 (Supp. 1976), nor obeyed the statutory directive "to furnish the means as shall be best designed to effect such rehabilitation," R.I.G.L. § 42–56–19 (Supp.1976); *see also* R.I.G.L. § 42–56–29 (Supp.1976). Defendants' unwillingness or inability to obey the clear commands of the above-cited Rhode Island statutes is actionable as a matter of state law, *cf. State v. Brant*, 99 R.I. 583, 209 A.2d 455 (1965), and is remediable in this Court by way of pendent jurisdiction. *Taylor v. Sterret*, 499 F.2d 367, 368 (5th Cir. 1974), cert. denied 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1974). *Compare Lombardo v. Meachum*, 548 F.2d 13, 15 (1st Cir. 1977).[31]

(5th Cir. 1977) failure to meet the minimum standards set by professional bodies is a factor to be considered in determining whether constitutional requirements have been met. *Cf. id.* (state code violation significant factor in determining existence of Eighth Amendment violation). *See also Estelle v. Gamble*, 429 U.S. 97, 103–104 n. 8, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In any event, the Court holds that conditions at the ACI are so gross as to violate the standards of basic humanity shared by most citizens. *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 689 (D.Mass. 1973).

**31.** Because it holds that defendants have a plain statutory duty to make rehabilitative programs available to each inmate under Rhode Island law, *see* R.I.G.L. § 42–56–31, the Court need not reach the more difficult question whether convicted adult inmates have a constitutional right to rehabilitation in an institution that otherwise comports with minimum constitutional standards. *See* n. 27 *infra*; *cf. Inmates of Boys' Training School v. Affleck*, 346 F.Supp. 1354, 1367 (D.R.I.1972) (confinement of juveniles in anti-rehabilitative setting violates due process); *Nelson v. Heyne*, 491 F.2d 352, cert. denied 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). This course is dictated by *Hagens v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). The question of state law is easily resolved, and abstention under the doctrine of *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 61

■ Viewed as part of the dehabilitating conditions that prevail in Maximum and Medium, the near-total absence of meaningful rehabilitative programs or recreational activity constitutes a failure on defendants' part of constitutional dimension. *Pugh v. Locke*, 406 F.Supp. at 330; *Holt v. Sarver*, 309 F.Supp. at 379.[32] The testimony established overwhelmingly, and without contradiction, that the idleness suffered by inmates at the ACI was excessive, engendering fear and violence and causing psychological deterioration. Experts of broad experience found it worse than any they had ever encountered, and believed it to be a major, and inevitable, cause of the violence and consequent fear and terror which pervades the ACI. If the fear and terror rise to constitutional dimension, then the condition which makes them inevitable is necessarily constitutionally intolerable. *Compare Newman v. Alabama*, 503 F.2d 1320, 1331.

5.

■ The system of classification currently in effect at the ACI fails to satisfy the requirement of R.I.G.L. § 42–56–29 (Supp.1976), which provide that each inmate:

> be studied and evaluated to determine whether such person shall be a maximum, medium or minimum security risk and to develop a program of rehabilitation, education and medical and other care as shall be deemed necessary and appropriate to prepare such person to become a useful member of society. During such period medical, psychometric and psychological examination shall be made of such person and the results thereof, together with the nature of the offense for which such person has been committed, the previous criminal history, if any, the recommendations of the department of the attorney general and of the sentencing court and the social history of such person shall be studied and evaluated in determining the degree of custodial care of such person, the rehabilitation program for such person, such medical or other care as may be necessary and such spiritual and religious guidance as shall be indicated by the preference of such person.

S.Ct. 643, 85 L.Ed. 971 (1941) seems unwarranted. *See Lombardo v. Meachum*, 548 F.2d 13, 15 n. 3 (1st Cir. 1977); *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *see also Taylor v. Sterret*, 499 F.2d 367 (5th Cir. 1974), *cert. denied* 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975) (pendent jurisdiction over state laws regarding prison conditions).

**32.** The Court agrees fully with the reasoning of Judge (now Circuit Judge) Henley in the leading case of *Holt v. Sarver*, 309 F.Supp. 362, 379 (E.D.Ark.1970), and finds it applicable to the case at bar:

> This Court knows that a sociological theory or idea may ripen into constitutional law; many such theories and ideas have done so. But, this Court is not prepared to say that such a ripening has occurred as yet as far as rehabilitation of convicts is concerned. Given an otherwise unexceptional penal institution, the Court is not willing to hold that confinement in it is unconstitutional simply because the institution does not operate a school, or provide vocational training, or other rehabilitative facilities and services which many institutions now offer.

> That, however, is not quite the end of the matter. The absence of an affirmative program of training and rehabilitation may have constitutional significance where in the absence of such a program conditions and practices exist which actually militate against reform and rehabilitation. . . .

> It can be said safely that except in a very, very few and unusual cases confinement in the Arkansas State Penitentiary today is the opposite of beneficial. As a generality it may be stated that few individuals come out of it better men for their experience; most come out as bad as they went in, or worse.

> Living as he must under the conditions that have been described, with no legitimate rewards or incentives, in fear and apprehension, in degrading surroundings, and with no help from the State, an Arkansas convict will hardly be able to reform himself, and his experience in the Penitentiary is apt to do nothing but instill in him a deep or deeper hatred for an alienation from the society that put him there. And the failure of the State to help him become a good citizen will be compounded by the ever present willingness of his fellow inmates to train him to be a worse criminal.

> Thus, the absence of rehabilitation services and facilities of which Petitioners complain remains a factor in the overall constitutional equation before the Court.

This statute, supplemented by the classification rules now in force by decree of this Court, see *Morris v. Travisono*, 310 F.Supp. 857, 865–871 (D.R.I.1970), and read together with R.I.G.L. §§ 42–56–1 and 42–56–19 (Supp.1976), create enforcible minimum standards for the classification process: defendants' undisputed, unexplained and unwarranted evisceration of these standards, to the point where they have become a sham and a mockery, is a violation of state law.[33] See *State v. Brant*, 99 R.I. at 586–87, 209 A.2d 455 (*semble*).

6.

As the factual findings recited earlier in this opinion indicate, the lawlessness that prevails at the ACI has led to an incredibly high proportion of inmates being held in protective custody, many of them at their own request. For these inmates, the price of security is high.[34] The totality of conditions in Medium, where most of these men are housed, constitute cruel and unusual punishment, the filth, noise, and idleness of life in Medium shock the conscience. In addition, defendants have seen fit to impose additional penalties upon protective custody inmates in the form of severely restricted access to the few available rehabilitative programs, more limited opportunities to exercise, and a reduced number of visits from the outside world. These restrictions are not imposed upon general population, and defendants have not come forward with any reasons for their imposition.

■ It is true that the mere fact that conditions in protective custody are more disagreeable than those generally prevalent at the ACI would not of itself raise constitutional problems, cf. *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (inter-prison transfers). Nevertheless, where the State has itself created the conditions that necessitate the widespread use of protective custody, where the totality of conditions of protective custody violate the Eighth Amendment, and where the restrictions complained of amount to additional punishment for which no penological explanation is offered, the additional restrictions are offensive to due process and equal protection and must be enjoined. See *Nadeau v. Helgemoe*, 423 F.Supp. 1250, 1260–1274 (D.N.H.1976). See generally Comment, 12 Harv.Civ.Rts.-Civ.Lib.L.Rev. 367, 393–404 (1977).

7.

■ It is truly shocking that convicted felons are routinely warehoused for years in the less than human atmosphere of the ACI. But it is absolutely intolerable that the same treatment is accorded to pre-trial detainees, who have not yet been found guilty of the offense with which they are charged and yet are kept for months in Maximum in the midst of convicted inmates and denied even the meager access to constructive programs that the latter enjoy. It is now settled that pre-trial detainees may be subjected only to those restraints necessary to insure their presence at trial. *Detainees of the Brooklyn House of Detention v. Malcolm*, 520 F.2d 392, 397 (2d Cir. 1975); *Anderson v. Nosser*, 438 F.2d 183, 190 (5th Cir. 1971); *Inmates of Suffolk County Jail*

---

33. Rhode Island has long required the classification of inmates at the ACI. See R.I.G.L. § 42–56–29 to § 42–56–32; *Morris v. Travisono*, 310 F.Supp. 857 (D.R.I.1970). The Court therefore need not decide whether the Constitution requires a minimally rational classification process, although most courts have concluded that it does, if only because excessive fear and violence cannot otherwise be contained. See, e. g., *Pugh v. Locke*, 406 F.Supp. 318, 330 (M.D.Ala.1976); *Rhem v. Malcolm*, 317 F.Supp. 594, 625 (S.D.N.Y.1974) and cases collected there, aff'd 507 F.2d 333 (2d Cir. 1975). The Court also does not decide whether a federal right would be violated on the basis of procedural or substantive infirmities in the classification procedures utilized in any particular case. Compare *Lombardo v. Meachum*, 548 F.2d 13, 15 (1st Cir. 1977); see also *State v. Brant*, 99 R.I. 583, 209 A.2d 455 (1965) (classification system). The gravamen of plaintiffs' action here is that the process has collapsed *in toto*, failing generally to meet the statutory requirements.

34. It appears that much of the "security" afforded inmates in protective custody is illusory, in light of evidence, *inter alia*, regarding continued sexual attacks on protective custody inmates by other protective custody inmates.

*v. Eisenstadt,* 360 F.Supp. 676, 685–86 (D.Mass.1973), *order aff'd,* 494 F.2d 1196 (1st Cir. 1974); *Smith v. Sampson,* 349 F.Supp. 268, 271 (D.N.H.1972); Note, Constitutional Limitations on the Conditions of Pretrial Detention, 79 Yale L.J. 941, 950 (1970).

Defendants do not seriously dispute that the current practice of commingling pre-trial detainees and convicted offenders in the conditions that now obtain in Maximum is constitutionally unacceptable. They argue that plans are afoot to move pre-trial detainees to a separate facility, presumably one that meets constitutional standards, and that they should be given time to implement these plans. This argument might have some force if the practice of housing pre-trial detainees were a temporary measure of recent origin. But this is not the case. Defendants have been keeping pre-trial detainees in Maximum for years, despite repeated warnings that the practice is dangerous and unacceptable. *See* American Justice Institute Report (1975); Report of the Committee to Investigate the Uprising at the Maximum Security Facility of the Adult Correctional Institutions on April 2, 1973 (1973); Report of the Citizens Action Council (1972). In the face of this long-standing practice, the Court cannot accept promises of improved conduct on the part of defendants in the future. They have simply lost their credibility on this point.

8.

 The grossly inadequate system of medical care, including psychiatric care, afforded inmates is part of the intolerable totality of conditions at the ACI which, as the Court has found, violates inmates'

Eighth and Fourteenth Amendment rights. *Compare Holt v. Sarver,* 309 F.Supp. 362, 380 (E.D.Ark.1970), *aff'd* 442 F.2d 304 (8th Cir. 1971), *on remand Holt v. Hutto,* 363 F.Supp. 194 (1973); *Hamilton v. Schiro,* 338 F.Supp. 1016 (E.D.La.1970). Together with the other unsanitary and dangerous conditions already detailed, the system of medical care services constitutes a significant part of an environment which is unfit for human habitation, an environment where inmates actually deteriorate, physically and mentally, while they are in custody.[35]

Alternatively, and as an additional ground of decision, plaintiffs urge the Court to find that the health care delivery system at the ACI, in its own right and without regard to the totality of conditions, is so inadequate as to violate the Eighth and Fourteenth Amendments to the Constitution.

 There is impressive unanimity of judicial opinion as to when inadequate medical care to prisoners reaches the level of a constitutional violation. Inadvertent or negligent errors in diagnosis or treatment are not enough to establish a constitutional violation. *Estelle v. Gamble,* 429 U.S. 97, 105–106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970); *Newman v. Alabama,* 503 F.2d 1320, 1330 n. 14 (5th Cir. 1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1974); *Todaro v. Ward,* 431 F.Supp. 1129, 1132 (S.D.N.Y. 1977). An individual seeking relief must prove "deliberate indifference to a prisoner's serious illness or injury," *Estelle v. Gamble,* 429 U.S. at 105, 97 S.Ct. at 291. In the case of a class action challenging the entire system of medical care delivery, "deliberate indifference" can be shown either

---

**35.** In many ways, the prohibition against cruel and unusual punishment is more flagrantly violated by punishment which is the result of administrative action or neglect than by excessive statutory penalties. Punishment which results from the deliberative processes of the legislature carries a presumption of regularity when confronted by an Eighth Amendment challenge; that presumption does not protect the arbitrary indifference, neglect, or cruelty of petty officials and administrators. *Gregg v.*

*Georgia,* 428 U.S. 153, 169, 96 S.Ct. 2909, 49 L.Ed.2d 859 (Stewart, Powell, and Stevens, JJ.) (1976). *See generally id.,* at 174–76, 179–82, 96 S.Ct. 2909. The Court questions whether the Rhode Island legislature would establish sentences explicitly requiring inmates to endure the grave risks of increased morbidity engendered by the unacceptable medical care available at the ACI, or other aspects of life at the ACI (fear of sexual attack and violence, risk of fire, and so on) detailed above.

by a series of incidents closely related in time or by evidence that "the medical facilities [are] so wholly inadequate for the prison population's needs that suffering would be inevitable." *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir. 1974); *Todaro v. Ward,* 431 F.Supp. at 1133. Plaintiffs' proof was directed at satisfying this second test, which amounts to a recklessness standard, and requires a showing of conscious disregard by the defendants of a substantial risk that serious injury or illness would be engendered or prolonged by the inadequacies of the medical system.

 The Court holds that plaintiffs have proved their case in this regard. While the delivery of medical services is not inadequate in a number of respects, and appears to be somewhat better than that found in the most egregious reported case, *Newman v. Alabama,* 349 F.Supp. 278 (M.D. Ala.1972), *aff'd* 503 F.2d 1320, *cert. denied,* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1974), the compendium of serious health- and life-threatening deficiencies established by clear and convincing and unrebutted testimony reveals far more than isolated instances of neglect. Instead, the record supports a finding that the present inadequate state of medical service delivery is, as a system, the product of callous indifference. Each of the deficiencies noted here has been brought to the Department's attention at least three times since 1973, and nearly every one remains unremedied today. The inadequacies established at trial involve not hyper-technical, esoteric advances of modern medicine, but the basic, life-preserving tests, procedures, and control mechanisms that constitute a minimally acceptable medical services system. In June of 1976, the Department was informed that no expansion of the present, and limited, medical services system should take place "until a basic reliable medical program is established." *See* Della Penn, Study of and Recommendations for Health Services, Rhode Island Department of Corrections (1976), pl. ex. 21, at 4, 20–23. Each of the major problems chronicled here has been found by other courts to be of constitutional magnitude. *See Newman v. Alabama,* 503 F.2d at 1330–1331, and cases collected there. This Court holds that medical services system at the ACI, by reason of the deficiencies set forth in this opinion, violates plaintiffs' Eighth and Fourteenth Amendment rights. *Newman v. Alabama, supra; Todaro v. Ward, supra; see also Bowring v. Godwin,* 551 F.2d 44 (4th Cir. 1977) (psychiatric care required by Eighth and Fourteenth Amendments).

### III

The Court must now face the difficult task of fashioning a remedy in this case. To begin at the area of broadest agreement, the record here overwhelmingly supports, and no one seriously disputes, the conclusion that the present Maximum facility is irremediably obnoxious to constitutional standards and that it must be closed, and it is so ordered in conformance with the timetable in the Order to be issued in these cases. But this is not simply a case where, if a new jail is built, all will be well. As other courts have recognized in identical situations, a new prison operated like the present structure would soon lose whatever momentary advantages accrued. *See Jones v. Wittenberg,* 330 F.Supp. at 712. The barbaric physical conditions at the ACI are but the ugly and shocking outward manifestations of a deeper dysfunction, an attitude of cynicism, hopelessness, predatory selfishness, and callous indifference that appears to infect, to one degree or another, almost everyone who comes in contact with the ACI and that the present administration, like its predecessors, appears powerless to correct or even arrest. If this diagnosis seems overly pessimistic, the Court can only reply that it is borne out by the nearly unanimous testimony of the inmates, correctional officials, and experts in this case, strengthened by the Court's own experience in nearly ten years of sitting in a succession of major cases dealing with conditions at the ACI,[36] and confirmed by the flood of prisoner petitions that continues unabated in this Court.

36. *See* page 960, *supra.*

To remedy the constitutional violations established, the Court is compelled to frame a remedy which will insure that plaintiffs' rights are vindicated with the maximum speed possible, taking into account that many of these intractable problems cannot be solved overnight. Any remedy framed by the Court will not, of course, trench upon the continuing obligation of the defendants to maintain, consistent with their responsibilities under state law, an orderly and secure institution.

Other courts have devised a wide range of approaches to resolving similar situations, and it should be emphasized to all concerned that the Court has extensive powers in this regard, including the transfer of prisoners to relieve overcrowding, the construction or alternation of prisons, the hiring of new personnel, affirmative action hiring programs, the elimination of certain types of employees, the institution of various programs, the development of standards and the renovation of facilities. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Williams v. Edwards, supra; Finney v. Arkansas Board of Corrections, supra; Newman v. Alabama, supra; Gates v. Collier, supra; Holt v. Sarver, supra; Barnes v. Government of the Virgin Islands, supra; Pugh v. Locke, supra; Inmates of Suffolk County Jail v. Eisenstadt, supra; Morales v. Turman, supra; Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala.1966), aff'd, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (*per curiam*); *Davis v. Watkins,* 384 F.Supp. 1196 (N.D. Ohio 1976); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.), *aff'd and remanded,* 507 F.2d 333 (2d Cir. 1974); *New York State Association for Retarded Children v. Rockefeller,* 357 F.Supp. 752 (E.D.N.Y.1973); *Nelson v. Heyne,* 355 F.Supp. 451 (N.D.Ind. 1972), aff'd, 491 F.2d 352 (7th Cir. 1974); *Inmates of Boys Training School v. Affleck,* 346 F.Supp. 1354 (D.R.I.1972). *See Comment* 12 Harv. C.R.–C.L. L.Rev. at 390. *Cf. Bounds v. Smith,* 430 U.S. 817 at 830, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

This Court has no interest in operating the Adult Correctional Institutions in Rhode Island. It is not equipped for that task.

Yet it has the duty to remedy the massive and serious constitutional violations established by plaintiffs. Corrections in Rhode Island are thus at the crossroads. If defendants are able to build and operate a constitutional prison system, this Court will gratefully turn to other pressing business. If defendants are unable to accomplish this task, the Court will have, in the end, but two last options: it will be forced to appoint its own expert or experts to do the job, assuming such persons can be found and that there is some chance of success; or the most drastic and unwanted measure of ordering the ACI closed. *See, e. g., Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676 (D.Mass.1973); *Hamilton v. Love,* 328 F.Supp. 1182, 1194 (E.D.Ark. 1971).

The ultimate solution to the deep-rooted problems of the ACI lies largely with choices that the State's elected and appointed officials must make in response to this Court's holding that the present correctional system is unconstitutional. The Court earnestly solicits their cooperation. However, it is clear beyond doubt that inadequate funding is no answer to the existence of unconstitutional conditions in state penal institutions.

> Let there be no mistake in the matter; the obligation of the Respondents to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what Respondents may actually be able to accomplish. If Arkansas is going to operate a Penitentiary System, it is going to have to be a system that is countenanced by the Constitution of the United States.

*Holt v. Sarver,* 309 F.Supp. 385. *See Finney v. Arkansas Board of Corrections,* 505 F.2d 194, 201 (8th Cir. 1974); *Gates v. Collier,* 501 F.2d 1291, 1319–1320 (5th Cir. 1974); *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972). It should be made plain to all concerned that failure to comply with the minimum standards set forth in the order of this Court will necessitate the clos-

ing of such facilities as remain unfit for human habitation.

For the present, the Court will order the defendants to take immediate action to correct the most glaring abuses this case has uncovered. Beyond that, the Court sets out in its order the minimum standards with which defendants must comply.[37]

The complex nature of the task at hand, and the demands on the Court's time and attention which would be entailed by direct court supervision of the remedial order, have led the Court to rely on a Master to assist the Court in the remedial phase of these cases. The Master will monitor the defendants' implementation of the decree, review and evaluate the feasibility of plans proposed by the defendants, assist the defendants in formulating plans, and suggest such modification or supplementation of the Court's Order as seems necessary. To the extent that the Master identifies factors which obstruct compliance with the decree, he shall so advise the Court, and shall suggest necessary action. In short, the Master will act under Fed.R.Civ.P. 53, as an arm and as the eyes and ears of the Court. Although the Court cannot delegate its responsibility finally to resolve any disputes between the parties which may arise during the implementation period, this responsibility can be more intelligently, and perhaps more sparingly, exercised by reason of the Master's fair and impartial assistance.

The costs of these proceedings will be taxed against the defendants.

An Order will be entered accordingly.

### ORDER

Pursuant to the findings of fact and conclusions of law set forth in the Opinion made and entered in this cause, it is the order, judgment, and decree of this Court that:

1. Defendants have violated plaintiffs' rights under the Eighth and Fourteenth Amendments to the Constitution as well as Title 42, Ch. 56 of the Rhode Island General Laws.

■ 2. (a) Defendants shall, within three months from the entry of this order, remove all awaiting trial detainees from the present Maximum Security Facility; shall thereafter house said detainees in facilities which are separate from facilities which house sentenced prisoners; and thereafter shall prevent intermingling of, and contact between, detainees and sentenced prisoners;

(b) defendants shall house pre-trial detainees in facilities which comply with the minimum standards set forth hereafter in paragraph 4, and detainees shall not be housed in dormitories;

(c) defendants, within three months from the entry of this order, shall provide each awaiting trial detainee with recreational programs, and shall make available as soon as possible access, on a voluntary basis, to constructive work opportunities, to educational programs and to treatment programs which deal with problems associated with drug addiction, alcoholism, mental illness and physical illness or disabilities.

■ 3. (a) Defendants shall, within thirty days from the entry of this order, advise the Court of a date certain when the present Maximum Security facility will no longer be used for housing prisoners, which date certain shall be no more than one year from the entry of the order; to the extent that the defendants are unable to comply with this deadline for those incorrigible inmates eventually to be housed in a new Maximum facility, the Court is prepared to permit retention of such inmates in the present structure, provided that the area housing them can be made fit for human

---

37. In the appendix, attached to this Opinion, the Court sets forth the standards published by professional bodies, and the leading cases, on which the minimum standards in paragraphs 4, 5, and 6 of the Order in this case are based.

The Court is not unmindful that the emergency measures set forth in its Order may necessitate the temporary use of facilities which do not lend themselves, in certain respects, to economically feasible compliance with each of the standards detailed herein. To that extent, the Court is prepared to modify the Order at the noticed request of the defendants with the advice of the Master.

habitation and provided further the defendants fully comply with the other relevant provisions of this order, particularly but not limited to paragraph 5;

(b) defendants shall within nine months from the entry of this order reduce the population of the Maximum Security facility in accordance with the reclassification process set forth hereafter in paragraph 5;

(c) defendants shall within six months from the entry of this order and for so long as they utilize the Maximum Security facility, bring said facility into economically feasible and practicable compliance with the minimum standards of the United States Public Health Service, the American Public Health Association and the Department of Health, State of Rhode Island, as they relate to food service, sanitation, lighting, plumbing and insect and rodent control.

4. (a) Defendants shall within nine months from the entry of this order, bring each building and facility under their control, particularly but not limited to the housing and food service areas of said buildings and facilities, into compliance with the minimum standards of the United States Public Health Service, the American Public Health Association, and the Department of Health, State of Rhode Island. (The separate compliance requirements for the Maximum Security facility are set forth in paragraph 3(c) above). Implementation of this paragraph 4(a) shall include, but not be limited to, the following:

(1) all facilities shall be adequately heated, lighted and ventilated. Windows and window panes shall be properly maintained and replaced when broken;

(2) each prisoner shall have access to household cleaning implements and supplies;

(3) a regular and effective program of insect and rodent control shall be undertaken;

(4) food shall be stored, prepared and served under sanitary conditions which meet minimum public health standards. Equipment shall be maintained in good working order. Kitchen employees and prisoners shall be adequately trained and supervised;

(5) all trash and debris shall be regularly removed from hallways, cellblocks, corridors and other common areas and trash and debris shall in no circumstances be stored or accumulated in vacant cells;

(6) all toilets, showers and wash basins shall be properly maintained and kept in good repair. Every cell shall be equipped with a working toilet that flushes from inside the cell and with a wash basin with hot and cold running water;

(7) no more than one prisoner shall be confined in any cell which is less than 60 square feet;

(8) every prisoner shall be provided with a clean mattress, which meets with federal fire safety standards, and with clean bed linens, towels and soap;

(9) each convicted prisoner housed in a dormitory shall have at least seventy-five square feet of personal living space and only those prisoners who have been classified as Minimum Security shall be housed in dormitories;

(10) each dormitory shall be equipped with at least one toilet to every 15 prisoners; one urinal or one foot of urinal trough to every 15 prisoners, one shower to every 15 prisoners and one sink to every 10 prisoners. Toilets and urinals shall be kept reasonably clean and in good working order.

(b) Defendants shall within one month from the entry of this order, employ a qualified sanitation or environmental health officer to assist the defendants in obtaining and maintaining compliance with the provisions of paragraphs 3.(c) and 4.(a).

(c) Defendants shall for one year from the entry of this order file a monthly written report with the Court setting forth their progress on implementing the provisions of this paragraph 4.

5. (a) Defendants, not having classified prisoners according to state law, shall, within six months from the entry of this order, reclassify all prisoners in the Rhode Island penal system.

(b) Defendants shall contract with a qualified person or organization to aid in the implementation of the reclassification process detailed in this paragraph. The parties shall, within thirty days from the entry of this order, submit to the Court the names of such qualified persons or organizations.

(c) Defendants shall, in the reclassification process, arrange for personal interviews of each prisoner and gather all pertinent information about each prisoner's community and institutional life, including, but not limited to, the following:

1. the age, offense, prior criminal record, vocational, educational and work needs, and physical and mental health care requirements of each inmate;

2. special needs arising from age, infirmity, psychological disturbance or mental retardation, requiring transfer to a more appropriate facility, or special treatment within the institution; and

3. eligibility for appropriate transfer to a pre-release, work-release, or other community-based facility.

(d) Defendants shall, as a result of the reclassification, develop a written classification plan for each prisoner and implement said plan by assigning prisoners to suitable facilities and programs. After nine months from the entry of this order, no prisoner who has been classified as Minimum or Medium custody shall be confined in the Maximum Security facility, and all newly sentenced prisoners who are in the process of being oriented and classified (now housed in the Admissions and Orientation Unit) shall be as required by state law totally separated from other sentenced and classified prisoners. Upgraded classification for any inmate shall not be delayed or denied for lack of program or housing space.

(e) In order to implement the reclassification process, defendants shall:

1. establish adult basic education programs with sufficient resources and staff so that every prisoner in the Rhode Island prison system shall have the opportunity to participate in these programs on a regular basis;

2. establish pre-vocational (including remedial education) and vocational training programs, designed to enhance marketable skills, with sufficient resources and staff so that every prisoner in the Rhode Island prison system shall have the opportunity to participate in said programs on a regular basis;

3. establish recreational and avocational programs with sufficient resources and staff so that every prisoner in the Rhode Island prison system shall have the opportunity to participate in said programs on a regular basis;

4. develop college extension programs so that they are available to prisoners at every Rhode Island prison facility;

5. create sufficient meaningful job opportunities so that every prisoner in the Rhode Island prison system shall have the opportunity to work and every prisoner who works at a job provided by the defendants shall be compensated for all work performed;

6. develop sufficient programs and facilities to provide that each prisoner, prior to release, is afforded the opportunity to participate in a transitional program designed to aid the prisoner's re-entry into society;

7. establish work-release, pre-release, and other community-based facilities to accommodate those prisoners who have been identified as appropriate for participation in such programs.

(f) Defendants shall review the classification plan of each prisoner no less than once every twelve months.

6. Defendants shall hire an adequate number of mental health professionals to diagnose, treat and care for those prisoners who have mental health problems.

7. Defendants shall within six months from the entry of this order bring the health care delivery system into compliance with the minimum standards of the American Public Health Association, the United States Public Health Service, and the Department of Health, State of Rhode Island.

8. (a) Defendants shall within thirty days from the entry of this order establish a program for the treatment of inmates physiologically addicted to drugs or alcohol that does not require withdrawal by means of an abrupt denial or "cold turkey" approach.

(b) Defendants shall within three months from the entry of this order establish a program for the treatment of drug abuse that is in compliance with the minimum standards of the American Public Health Association, the United States Public Health Service, and the Department of Health, State of Rhode Island.

(c) Defendants shall within thirty days from the entry of this order place the responsibility for the treatment of drug abuse under a physician able and willing to treat prison addicts.

9. Defendants shall within nine months from the entry of this order house all protective custody prisoners in accordance with the standards set forth for the general prisoner population in paragraph 4., and make available to protective custody prisoners the equivalent of the educational, vocational, recreational, avocational, job, transitional and community-based facility opportunities set forth in paragraph 5.

10. Within nine months from the entry of this order, every prisoner shall be confined in an institution suitable to his or her security classification.

11. A Master shall be appointed by the Court within thirty days and shall be empowered to monitor compliance with and implementation of the relief ordered in this case, in keeping with its purposes as recited in the Opinion. The Master shall also advise and assist the Department to the fullest extent possible. The Master will report on a monthly basis to the Court on the progress of such compliance and implementation.

(a) In order to carry out his duties, the Master or his delegates shall have unlimited access to any facilities, buildings or premises under the control of the Department of Corrections, or any records, files or papers maintained by said Department. Access shall be granted at any time and no advance notice shall be necessary.

(b) The Master is authorized to conduct confidential interviews at any time, without advance notice, with any staff member or employee of the Department or any prisoner. The Master or his delegate may attend any institutional meetings or proceedings.

(c) The Master may require written reports from any staff members or employees of the Department of Corrections with respect to compliance with and implementation of this Court's orders.

(d) The Master shall be empowered to recommend to the Court that any staff member or employee of such Department be moved or transferred within the Department as he deems necessary to obtain compliance with and implementation of this Court's order. In the event that hiring of additional personnel or the termination of any current personnel is necessary to carry out or to prevent interference with the Court's order, the Master shall file a written report with the Court explaining why such action is necessary. Defendants may file a written response to the report and the Court shall approve or reject the recommendation of the Master.

(e) The Master may act as a whole or through subcommittees appointed by him.

(f) The Master is authorized to select and hire with the prior approval of the Court, a full time staff consultant if such person is needed to assist him in carrying out his duties and one full time clerk-stenographer if needed. Adequate offices, equipment and supplies shall be made available by the defendants. The Master may also consult appropriate, independent specialists.

(g) Necessary expenses for carrying out the Master's duties shall be paid pursuant to Rule 53, Federal Rules of Civil Procedure, and shall be taxed as part of the costs of this case against the defendants in their official capacities.

12. The defendants shall, within six months from the date of this order, submit

to the Master and to the Court a comprehensive report setting forth their progress in the implementation of each and every subparagraph of this order. The report shall also include a timetable for full compliance.

13. Defendants shall pay to plaintiffs' counsel reasonable attorneys fees pursuant to Title 42 U.S.C. § 1988 together with costs and expenses incurred by plaintiffs in the prosecution of this action.

14. Jurisdiction is specifically retained in this case.

## ADDENDUM

In further clarification of footnote 37 in the Opinion of the above-captioned cases dated August 10, 1977, the Court states it is not unmindful of the time strictures recited therein. For good cause shown and at the noticed request of the defendants, the Court is prepared to modify the same.

## APPENDIX A

Set forth below are the leading standards published by professional bodies, and the leading cases, on which the minimum standards embodied in paragraphs 4, 5, and 6 of the order in these cases are based. The Court also relied on the expert testimony adduced at trial.

*Table of Abbreviations*

N.A.C. – National Advisory Commission on Criminal Justice Standards and Goals, *Report on Corrections* (1973)

A.C.A. – American Correctional Association, *Manual of Correctional Standards* (1966)

A.B.A. – American Bar Association Section of Criminal Justice, *Draft of Standards Relating to the Legal Status of Prisoners* (1977)

A.P.H.A. – American Public Health Association, *Standards for Health Services in Correctional Institutions* (1976)

Walton – Walton, Graham, *Institutional Sanitation,* United States Bureau of Prisons, 1965

N.S.A. – National Sheriffs Association, *Standards for Inmates Legal Rights* (1974)

A.L.I. – American Law Institute, *Model Penal Code – Part III on Treatment and Correction* (1962)

The N.A.C., A.C.A., N.S.A., and A.L.I. standards are collected in United States Department of Justice, Law Enforcement Assistance Administration, Compendium of Model Correctional Legislation and Standards (2nd ed. 1975). *See also* Estelle v. Gamble, 429 U.S. 97, 103–4 n. 8, 97 S.Ct. 285, 50 L.Ed.2d 251 (compilation of minimum standards); *id.,* at 110–111 n. 3, 97 S.Ct. at 294 n. 3 (Stevens, J., dissenting) (compilation of minimum health and medical care standards in prisons).

*4.(a)*

N.A.C. – Standard 2.5 and Commentary at 34–35

A.C.A. – Principle XVI and Chapter 20, pp. 346–347 and Chapter 27

A.B.A. – Standard 6.12 and Commentary at 559–561

A.P.H.A. – Chapters VI and VII

N.S.A. – Principle 3

Walton – entire volume

*Williams v. Edwards,* 547 F.2d 1206, 1214 (5th Cir. 1977)

*Gates v. Collier,* 501 F.2d 1291, 1302 (5th Cir. 1974), *further relief granted,* 423 F.Supp. 732 (N.D. Miss.1976)

*Kirby v. Blackledge,* 530 F.2d 583 (4th Cir. 1976)

*Newman v. Alabama,* 503 F.2d 1320 (5th Cir. 1974)

*Mitchell v. Untreiner,* 421 F.Supp. 886, 890 (N.D.Fla.1976)

*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1234 (D.V.I.1976)

*Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 676–677 (S.D.Tex.1975)

*Pugh v. Locke,* 406 F.Supp. 318, 334–35 (M.D.Ala.1976)

*Hamilton v. Landrieu,* 351 F.Supp. 549, 554 (E.D.La.1972)

*4.(a)(1)*

A.P.H.A. – Chapter VI, Sections B.4, C.1, C.2, C.5

Walton

A.C.A. – Ch. 20, pp. 346–347

N.A.C. – Standard 2.5
A.B.A. – Standard 6.12
N.S.A. – Principle 3
*Rozecki v. Gaughan,* 459 F.2d 6 (1st Cir. 1972)
*Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Ala.1976)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 554 (E.D.La.1972)
*Inmates of the Boys' Training School v. Affleck,* 346 F.Supp. 1354, 1373 (D.R.I.1972)
*Jones v. Wittenberg,* 330 F.Supp. 707, 721 (N.D.Ohio 1971)

*4.(a)(2)*

A.B.A. – Standard 6.12
A.P.H.A. – Chapter VI, Sections C.6, E.1
*Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Ala.1976)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 553 (E.D.La.1972)
*Hamilton v. Love,* 328 F.Supp. 1182, 1185 (E.D.Ark.1971)
*Gates v. Collier,* 423 F.Supp. 732, 742 (N.D.Miss.1976)

*4.(a)(3)*

A.P.H.A. – Chapter VI, D.3
Walton
*Mitchell v. Untreiner,* 421 F.Supp. 886, 898 (N.D.Fla.1976)
*Tate v. Kassulke,* 409 F.Supp. 651, 661 (W.D.Ky.1976)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 553 (E.D.La.1972)
*Hamilton v. Love,* 328 F.Supp. 1182, 1185 (E.D.Ark.1971)

*4.(a)(4)*

A.B.A. – Standard 6.12
A.C.A. – Ch. 27
A.P.H.A. – Chapter VI, Section D.1, Chapter VII
Rules and Regulations Pertaining to Food Establishments, State of Rhode Island, Department of Health, Defendants' Exhibit E
*Mitchell v. Untreiner,* 421 F.Supp. 886, 900 (N.D.Fla.1976)
*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1232, 1234 (D.V.I.1976)
*Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Ala.1976)
*Bel v. Hall,* 392 F.Supp. 274, 277 (D.Mass.1974)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 553 (E.D.La.1972)
*Collins v. Schoonfield,* 344 F.Supp. 257, 279 (D.Md.1972)
*Jones v. Wittenberg,* 330 F.Supp. 707, 716 (N.D.Ohio 1971)

*4.(a)(5)*

A.P.H.A. – Chapter VI, Sections B.2 and C.6
Walton
A.B.A. – Standard 6.12
*Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 553 (E.D.La.1972)
*Collins v. Schoonfield,* 344 F.Supp. 257, 279 (D.Md.1972)

*4.(a)(6)*

A.B.A. – Standard 6.12
A.P.H.A. – Chapter VI, Sections D.5, C.6, E.1 & 2
Walton
*Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976)
*Tate v. Kassulke,* 409 F.Supp. 651, 662 (W.D.Ky.1976)
*Inmates of Suffolk County Jail v. Eisenstadt,* 360 F.Supp. 676, 690 (D.Mass.1973)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 553–554 (E.D.La.1972)

*Jones v. Wittenberg,* 330 F.Supp. 707, 721 (N.D.Ohio 1971)
*Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975)

*4.(a)(7)*
N.A.C. – Standard 2.5
A.B.A. – Standard 6.12
A.P.H.A. – Chapter VI, Section C.3
National Sheriffs Association, Handbook on Jail Architecture
*Gates v. Collier,* 390 F.Supp. 482 (N.D.Miss.1975)
*Ambrose v. Malcolm,* 414 F.Supp. 485 (S.D.N.Y.1976)
*Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582 (D.P.R.1976)
*Campbell v. McGruder,* 416 F.Supp. 100, 106 (D.D.C.1976)
*Inmates of D. C. Jail v. Jackson,* 416 F.Supp. 119 (D.D.C.1976)
*Taylor v. Perini,* 413 F.Supp. 189 (N.D.Ohio 1976)
*Miller v. Carson,* 401 F.Supp. 835 (M.D.Fla.1975)
*Alberti v. Sheriff of Harris County,* 406 F.Supp. 649 (S.D.Tex.1975)

*4.(a)(8)*
A.C.A. – Ch. 20, pp. 346–347, Ch. 28, p. 463
A.B.A. – Standard 6.12
A.P.H.A. – Chapter VI, Sections E.1 and 2
N.S.A. – Principle 3
*Mitchell v. Untreiner,* 421 F.Supp. 886, 897 (N.D.Fla.1976)
*Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 596 (D.P.R.1976)
*Tate v. Kassulke,* 409 F.Supp. 651, 662 (W.D.Ky.1976)
*Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Ala.1976)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 553 (E.D.La.1972)
*Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971)
*Campbell v. McGruder,* 416 F.Supp. 100 (D.D.C.1975)

*4.(a)(9)*
A.P.H.A. – Chapter VI, C.3
*Pugh v. Locke,* 406 F.Supp. 318, 334 (M.D.Fla.1976)

*4.(a)(10)*
Walton
A.P.H.A. – Chapter VI, Section E.2
*Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976)

*4.(b)*
A.P.H.A. – Chapter VI, Section F
A.C.A. – Ch. 27, p. 453
*Mitchell v. Untreiner,* 421 F.Supp. 886, 898, 900 (N.D.Fla.1976)
*Pugh v. Locke,* 406 F.Supp. 318, 333 (M.D.Ala.1976)
*Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 677 (S.D.Tex.1975)

*5.(a)*
N.A.C. – Chapter 6
A.B.A. – Standard 3.5 and Commentary at 455–458
A.C.A. – Chapter 21
R.I.G.L. – § 42–56–29
*Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla.1976)
*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1232 (D.V.I.1976)
*Pugh v. Locke,* 406 F.Supp. 318, 333 (M.D.Ala.1976)
*Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 594 (D.P.R.1976)
*Rhem v. Malcolm,* 396 F.Supp. 1195 (S.D.N.Y.1975)
*Hamilton v. Landrieu,* 351 F.Supp. 549, 552 (E.D.La.1972)

*Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971)

*Hamilton v. Love,* 328 F.Supp. 1182 (E.D.Ark.1971)

*5.(b)*

*Pugh v. Locke,* 406 F.Supp. 318, 333 (M.D.Ala.1976)

*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1233 (D.V.I.1976)

*5.(c)*

R.I.G.L. – § 42–56–29

*Morris v. Travisono,* 310 F.Supp. 857, 865 (D.R.I.1970)

A.C.A. – Chapter 21, pp. 356–362

*Pugh v. Locke,* 406 F.Supp. 318, 333 (M.D.Ala.1976)

*Martinez Rodriguez v. Jimenez,* 409 F.Supp. 582, 594, 596 (D.P.R.1976)

*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1233 (D.V.I.1976)

N.A.C. – Standard 11.5(3)

*5.(d)*

R.I.G.L. – § 42–56–29

*Morris v. Travisono,* 310 F.Supp. 857, 865 (D.R.I.1970)

*Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976)

A.C.A. – Chapter 21, p. 362

*5.(e)*

*Educational Programs*

N.A.C. – Standards 2.9, 11.4

A.B.A. – Standard 5.7

A.C.A. – Chapters 21 and 30

A.L.I. – Articles 304.6 and 304.8

*Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976)

*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1233 (D.V.I.1976)

*Mitchell v. Untreiner,* 421 F.Supp. 886, 901 (N.D.Fla.1976)

*Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970)

*Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 673, 677 (S.D.Tex.1975)

*Miller v. Carson,* 401 F.Supp. 835, 900 (M.D.Fla.1975)

*Hamilton v. Landrieu,* 351 F.Supp. 549, 552 (E.D.La.1972)

*Brenneman v. Madigan,* 343 F.Supp. 128 (N.D.Cal.1972)

*Jones v. Wittenberg,* 330 F.Supp. 707, 717 (N.D.Ohio 1971)

*Vocational and Meaningful Work Programs*

N.A.C. – Standards 2.9, 11.4 and 11.10

A.C.A. – Chapters 21 and 30

A.B.A. – Standards 4.1–4.4

A.L.I. – Articles 304.6 and 304.8

*Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976)

*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1233 (D.V.I.1976)

*Alberti v. Sheriff of Harris County,* 406 F.Supp. 649, 677 (S.D.Tex.1975)

*Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970)

*Recreational and Avocational Programs*

N.A.C. – Standards 2.9 and 11.8

A.C.A. – Chapters 21 and 32

*Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1233 (D.V.I.1976)

*Pugh v. Locke,* 406 F.Supp. 318, 335 (M.D.Ala.1976)

*Moore v. Janing,* 427 F.Supp. 567, 575 (D.Neb.1976)

*Mitchell v. Untreiner,* 421 F.Supp. 886, 901 (N.D.Fla.1976)

*Alberti v. Sheriff of Harris County,* 406 F.Supp. 649 (S.D.Tex.1975)

*Rhem v. Malcolm,* 396 F.Supp. 1195, 1202 (S.D.N.Y.1975)

**994**

*Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676 (D.Mass.1973)
*Hamilton v. Landrieu*, 351 F.Supp. 549, 550 (E.D.La.1972)
*Jones v. Wittenberg*, 330 F.Supp. 707, 717 (N.D.Ohio 1971)
*Hamilton v. Love*, 328 F.Supp. 1182, 1185 (E.D.Ark.1971)

*Pre-release and Transition Programs*

N.A.C. – Standards 7.1 and 7.4 and accompanying commentary
*Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976)

*5.(f)*
A.B.A. – Standard 3.5
A.C.A. – Chapter 21
*Pugh v. Locke*, 406 F.Supp. 318, 333 (M.D.Ala.1976)
*Barnes v. Virgin Islands*, 415 F.Supp. 1218, 1233 (D.V.I.1976)

*6.*
N.A.C. – Standard 11.5(3)
A.B.A. – Standards 5.1 and 5.2
A.C.A. – Chapter 26, pp. 436–443
*Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977)
*Pugh v. Locke*, 406 F.Supp. 318, 333 (M.D.Ala.1976)
*Barnes v. Virgin Islands*, 415 F.Supp. 1218, 1232, 1234 (D.V.I.1976)
*Alberti v. Sheriff of Harris County*, 406 F.Supp. 649, 677 (S.D.Tex.1975)
*Battle v. Anderson*, 376 F.Supp. 402, 434 (E.D.Okl.1974)
*Newman v. Alabama*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied* 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975)